UNITED STATES of America,

v.

Robert P. MORAN; Chance E. Heffner;
James H. Mathis; Faith Burke; Don-
ald Lashway; David L. Cook; and
Thomas A. Corigliano, Defendants.

No. 1:03–CR–452.

United States District Court,
N.D. New York.

Jan. 5, 2005.

Hon. Glenn T. Suddaby, United States Attorney, Syracuse, NY (David M. Grable, Assistant U.S. Attorney, of counsel), Attorney for United States, Northern District of New York.

Kevin Mulroy, Syracuse, NY, for Defendant, Robert P. Moran.

Office of Federal Public Defender, Albany, NY (Kent B. Sprotbery, of counsel), Attorney for Defendant Chance E. Heffner.

Roche Corrigan Mccoy & Bush, Albany, NY (Joseph M. Mccoy, of counsel), Attorney for Defendant James H. Mathis.

Tobin & Dempf, Albany, NY (Kevin A. Luibrand, of counsel), Attorney for Defendant James H. Mathis.

Ackerman, Wachs & Finton, Albany, NY (Fred Stanton Ackerman, Andrew M. Pur-

rott, of counsel), Attorneys for Defendant Donald Lashway.

Kevin E. McCormack, Syracuse, NY, for Defendant David L. Cook.

Frank Policelli, Utica, NY, Attorney for Defendant Thomas A. Corigliano.

TABLE OF CONTENTS

I. INTRODUCTION ..................................................432

II. BACKGROUND ..................................................433
 A. Initial Investigation ......................................433
 B. June 16, 2003 Eavesdropping Warrant—Residence Telephone –1193 ..........435
 C. July 15, 2003, Eavesdropping Warrant—Cellular Telephone –2285 ...........436
 D. Extension of June 16 Warrant (–1193) ......................438
 E. August 1, 2003, Eavesdropping Warrant .....................439
 F. Extension of July 15 Warrant (–2285) .......................443
 G. Search Warrant...........................................444

III. STANDARDS ..................................................453
 A. Eavesdropping Warrants ..................................453
 B. Search Warrant...........................................455
 C. Probable Cause ..........................................456

IV. DISCUSSION ..................................................456
 A. Moran ..................................................456
 1. 2518 (1)(c), 2518(3)(c)—Need for Wiretap ..............456
 2. Misstatements and Omissions—Wiretap Applications....................461
 3. 18 U.S.C. § 2518(5)—Minimization....................464
 4. Search Warrant ....................................465
 5. Miscellaneous Motions .............................466
 6. GPS Device........................................467
 B. Heffner ................................................468
 C. Lashway ...............................................470
 D. Cook ..................................................473
 E. Corigliano..............................................478
 1. Omnibus Motion...................................478
 2. Motion to Dismiss the Indictment......................479

V. CONCLUSION ..................................................481
 A. Moran ..................................................481
 B. Heffner ................................................481
 C. Lashway ...............................................482
 D. Cook ..................................................482
 E. Corigliano..............................................482

### MEMORANDUM–DECISION and ORDER

HURD, District Judge.

### I. INTRODUCTION

The defendants were charged with narcotics trafficking offenses in violation of 21 U.S.C. § 846 and 18 U.S.C. § 1 (1 count); 21 U.S.C. § 841 and 18 U.S.C. § 2 (7 counts); and 18 U.S.C. §§ 922(g) and 924(a)(2) (1 count), in a second superseding indictment dated April 15, 2004. Defendant Robert P. Moran, Jr., Esq. ("Moran") filed omnibus motions seeking miscellaneous relief including suppression of evidence derived from a telephone wiretap warrant issued on June 16, 2003, and thereafter extended; a cellular telephone

wiretap warrant issued on July 15, 2003, and thereafter extended; a search warrant issued on August 17, 2003; and the warrantless use of a GPS tracking device on his vehicle. Defendant Chance E. Heffner ("Heffner") moved to suppress all physical evidence seized pursuant to the search warrant at his residence, 403 Fishing Rock Road, and from his vehicles (a 1997 Mercury sedan, a 1972 Winnebago, and a 1985 Harley Davidson motorcycle). Defendant Donald Lashway ("Lashway") filed an omnibus motion on March 12, 2004, and a supplemental motion to suppress on May 28, 2004. Defendant David L. Cook ("Cook") filed an omnibus motion on February 11, 2004. He subsequently withdrew that portion of the motion seeking discovery pursuant to Fed.R.Crim.P. 16. Cook filed a supplemental motion to suppress on June 2, 2004. Defendant Thomas A. Corigliano ("Corigliano") filed an omnibus motion on June 2, 2004.

The government opposes each defendants' motions. Oral argument was heard on June 22, 2004. Decision was reserved.

On July 20, 2004, Corigliano filed a motion to dismiss the indictment. The government opposed. Corigliano's motion was taken on submission without oral argument.

## II. *BACKGROUND*

### A. *Initial Investigation*

In the spring of 2003 the Oneida County Sheriff's Department formed a gang intelligence detail, to which Investigator Keith C. Grogan ("Grogan") was appointed. The gang intelligence detail was formed to gain, gather, and share intelligence regarding gang activity in and around Oneida County in cooperation with other law enforcement agencies. Grogan, a fourteen-year veteran of the Oneida County Sheriff's Department, developed a confidential informant ("CI") in April 2003, in the course of pursuing the goals of the gang intelligence detail. The CI informed Grogan about local motorcycle clubs and the alleged distribution of methamphetamine.

According to Dennis Tomasone ("Tomasone"), a Special Investigator for the New York Attorney General's Organized Crime Task Force, on April 16, 2003, two members of the Hell's Angels Motorcycle Club ("Hell's Angels"), Keith Gagnon ("Gagnon") and Heffner, were seen exiting the Hell's Angels Troy, New York, club house. They were followed to 403 Fishing Rock Road, Middleville, New York, where surveillance of them was discontinued because of the difficulties inherent in conducting physical surveillance of a rural location. It was later determined that Gagnon and Heffner were residing at 403 Fishing Rock Road.

The telephone toll records for 403 Fishing Rock Road (315–891–3719) were obtained by subpoena. Review of the telephone log from February 6, 2003, through April 24, 2003, revealed calls to the Hell's Angels' Troy club house; two telephone calls to 315–336–1410 ("–1410"), Moran's law office in Rome, New York; and ninety-eight (98) calls to 315–337–1193 ("–1193"), Moran's residence at 6196 Hawkins Corners Road, Lee Center, New York ("Hawkins Corners residence"). Telephone toll records were also obtained by subpoena for Verizon cellular telephone 518–339–1890, which was listed to a Keith Gagnor, Palmyra, Me., an address sometimes used by Gagnon. There were twenty-two numbers in common between that cellular telephone and the 403 Fishing Rock Road telephone.

A comparison of the telephone log for –1193, also obtained by subpoena, revealed five numbers in common with Gagnon's residence or cellular telephone for the time

period March 1, 2003, to April 24, 2003. This review also revealed eighteen calls to the 403 Fishing Rock Road telephone. Five calls were made to 518–273–3230, a number listed to Flesh Jess Tattoos, which is owned by a member of the Troy Hell's Angels. Twenty-two calls were made to 518–838–9967, a number listed to the girlfriend of Lashway, who is a Troy Hell's Angel. Eleven calls were made to 518–589–0411, which was listed to an address that is the residence of Edward J. ("Hartery"), a Troy Hell's Angel. One call was made to 607–343–0391, a number listed to the wife of Timothy Mancini, the President of the Red Devils Motorcycle Club, a Hell's Angels affiliate. Eight calls were made to numbers (cellular and home) listed to Robert W. Moran[1] ("Bugsy Moran"), a Hell's Angel in Rochester, New York.

On April 20, 2003, New York State Trooper Daniel C. Snyder, Jr. ("Snyder") observed a motorcycle with a loud exhaust, being driven by an operator displaying the Hell's Angels' colors, enter the parking lot of a convenience store in Marcy, New York. Snyder, intending to investigate the loud exhaust, parked across the street. The motorcycle operator sat on the curb and made a cellular telephone call when he saw the trooper. After waiting about forty minutes, Snyder pulled into the parking lot of the convenience store so that his partner could go inside. He observed the motorcycle to have New York Registration number 66DA83. He and the motorcycle operator engaged in a conversation, during which the motorcycle operator stated that he was lost and was looking for Lee Center, but that his friend was coming from Lee Center to get him. In a short time a Toyota Sport Utility Vehicle ("SUV") with New York State registration CLC 7851 pulled up. The motorcycle followed the SUV to Rome, New York, when both vehi-

cles pulled into a parking lot. Snyder then ended the surveillance. New York registration CLC 7851 is registered to Moran.

Snyder later identified the motorcycle operator as Bugsy Moran. He also determined that New York State motorcycle registration 66DA83 was registered to Bugsy Moran's wife. He also later determined that Bugsy Moran had been arrested on March 1, 2003, by the Wayne County Sheriff's Department and charged with possession of methamphetamine.

Also at some time in April 2003, an investigator with the Oneida County Drug Task Force advised Grogan that a Rome resident, thought to be a prospect for Hell's Angels, had been physically beaten by the Hell's Angels in Rochester. Information had been provided to that investigator and to the Rome, New York, Police Department, that the assault in Rochester occurred as the result of a money shortage on a drug deal.

In mid-May 2003, Grogan supervised a controlled buy of methamphetamine. His CI made a telephone call to –1193 to arrange the drug purchase. Grogan searched the CI and found no drugs. Grogan then provided money with which the CI would make the purchase. The CI went to the Hawkins Corners residence. A female known to be Roberta Lynn Cochis ("Cochis"), who was Moran's girlfriend and resided with him, exited the residence and spoke to the CI. The CI entered the house to complete the drug transaction. Shortly thereafter the CI provided Grogan with a small plastic bag containing a white powdery substance later identified as containing methamphetamine. The CI had at least two additional telephone conversations regarding potential drug transactions with Cochis after the controlled buy.

1. Moran and Robert W. Moran are not related.

**B.** *June 16, 2003 Eavesdropping Warrant—Residence Telephone –1193*

On June 16, 2003, the Oneida County District Attorney applied to a New York State Court for an eavesdropping warrant for the –1193 telephone line. The application sought the warrant to secure evidence of certain conspiracy and controlled substances offenses under New York law against Moran, Cochis, and unidentified co-conspirators. The affidavits of Grogan, New York State Police investigator James E. Jecko ("Jecko"), and Tomasone; the supporting deposition of Snyder; a supporting deposition from the Rochester Police Department; and the sworn testimony of the CI were submitted in support of the application.

Grogan, Jecko, and Tomasone each delineated their experience as law enforcement officers. In each case the experience included investigating controlled substances trafficking. They each then outlined their part of the initial investigation.

Grogan related his dealings with the CI and noted that he had corroborated much of the information provided to him by the CI. He stated that it is known that the Hell's Angels are involved in the production and distribution of methamphetamine, and that he had been so informed by other law enforcement officers, such as Kevin Patrick McDonough of the Middle Atlantic–Great Lakes Organized Crime Law Enforcement Network. Grogan noted that Moran is an attorney, but any conversations sought regarding the possession and distribution of methamphetamine would not be protected by the attorney-client privilege. He stated that he had attempted to surveil the Hawkins Corners residence, but had been unsuccessful. He opined that such surveillance would be noticed by Moran, Cochis, or Hell's Angels prospect Matthew Ortolano (who lives near the Hawkins Corners residence and dates Moran's secretary). Grogan related information given him by other law enforcement personnel that Hell's Angels conduct counter-surveillance, including photographs and video equipment that would allow them to identify surveillance equipment such as vehicles and pole cameras.

Grogan opined that future traditional investigative techniques would be unyielding. Introducing an undercover officer would not be successful because Moran, due to his profession as an attorney, is familiar with most local undercover officers. Additionally, Moran would not sell methamphetamine to someone with whom he is unfamiliar. Further, given the nature of the Hell's Angels organization, it would be impossible to introduce an undercover agent into the organization, and Grogan's CI was not in a position to infiltrate the organization. Finally, Grogan opined that Moran was being supplied methamphetamine by Hell's Angels, and that deals and deliveries were being arranged via telephone.

Jecko set forth his analysis of the toll records from –1193 for the period of March 1, 2003, to April 24, 2003. He then stated that historically it has been difficult to infiltrate the Hell's Angels. They are a highly secretive group, who's members often reside at locations owned or rented by others. They frequently use other person's names to register vehicles and to obtain utilities and services in an attempt to remain unidentified by law enforcement They often reside in rural locations where surveillance would be easily detected. Additionally traditional investigative techniques are unfruitful. Hell's Angels members monitor police frequency scanners. They use counter-surveillance techniques such as periodically photographing the areas surrounding their club houses and residences. The photographs are compared in order to determine the presence of law

enforcement investigators. Hell's Angels have an initiation process during which prospects are required to commit criminal acts or use narcotics. This initiation process is one way in which members can identify undercover law enforcement officers attempting to infiltrate the organization, because they would be unable to commit the criminal acts or use narcotics. For these reasons, Jecko stated that conventional methods of investigation into the criminal activities of the Hell's Angels have been ineffective. Further, he opined that non-traditional investigatory methods, such as eavesdropping warrants, would be highly effective in furthering the investigation into the narcotics trafficking activities of the Hell's Angels.

Tomasone related the initial surveillance of Gagnon and Heffner, leading to review of the telephone toll records for 403 Fishing Rock Road and a comparison with, inter alia, the telephone toll records for –1193, as detailed above. Tomasone noted that the rural location made surveillance of 403 Fishing Rock Road very difficult. He further noted that to date, conventional means of investigation had been unsuccessful in infiltrating the group.

Snyder's supporting deposition set forth the occurrences on April 20, 2003. On that day he observed Hell's Angel Bugsy Moran in Marcy, New York, who then met and followed Moran into Rome, New York. The details of this incident are set forth above.

The supporting deposition from the Rochester Police Department set forth background information on Bugsy Moran. Bugsy Moran is a member and current Sergeant at Arms for the Rochester Hell's Angels. He has been a member since 1996. There is a physical description of him as well as other facts such as his residence and marital status. Bugsy Moran was arrested on March 1, 2003, and charged with possession of methamphet-amine. He was last arrested by the Rochester Police Department on May 16, 2002, for two counts of third degree assault. The vehicles he uses are a 1986 van registered to his wife, a 1995 sedan, a 1999 Cadillac registered to his deceased father, a 2002 Harley Davidson motorcycle registered to his wife, and a 1969 dump truck registered to his wife. The deposition notes that members of motorcycle gangs including Hell's Angels frequently use vehicles registered to non-members to avoid detection by law enforcement officials and rival motorcycle gang members.

Based upon the facts set forth in the submissions (as related above), and the sworn testimony of the CI, Acting Supreme Court Justice Barry M. Donalty ("Judge Donalty") issued a warrant permitting the interception of telephone and electronic communications over the –1193 line for a period of thirty days ("June 16 Warrant"). The June 16 Warrant further permitted installation of a pen register and caller identification devices on the –1193 telephone line.

On June 24, 2003, Judge Donalty issued an amended eavesdropping warrant. The amended warrant included authorization for the New York State Attorney General's Organized Crime Task Force and the United States Federal Bureau of Investigation ("FBI") to execute the warrant, in addition to the New York State Police and the Oneida County Sheriff's Department authorized by the original warrant.

### C. July 15, 2003, Eavesdropping Warrant—Cellular Telephone –2285

On July 15, 2003, the Oneida County District Attorney applied for an additional eavesdropping warrant for 315–534–2285 ("–2285"). This number (–2285) is for a cellular telephone subscribed to by Moran. The proposed eavesdropping warrant sought evidence of narcotics trafficking of-

fenses by Moran, Cochis, Heffner, Bugsy Moran, Lashway, Gregory Heine a/k/a/ "Pep" or "Pepe" ("Heine"), Hartery, and other yet unknown co-conspirators. The proposed eavesdropping warrant also sought to identify other co-conspirators, and determine the ultimate source of the methamphetamine, the path of illegally gotten gains, and the structure of the distribution network for the sale and possession of methamphetamine. The following facts, derived from monitoring the telephone calls intercepted pursuant to the June 16 Warrant, were set forth in Jecko's affidavit in support of the application, along with transcripts of some of the intercepted calls.

On numerous occasions members of Hell's Angels attempted to contact Moran at home (–1193) and were told to call him on his cellular telephone (–2285). On July 5, 2003, Cochis, and then Moran, carried on a conversation with Cheryl Hoecherl ("Hoecherl"), who was at her home in Arizona. Hoecherl is the girlfriend or wife of Heine, a Hell's Angel of sixteen years. During the course of the conversation, Hell's Angels business was discussed.

On July 8, 2003, police in Arizona conducted a simultaneous raid on numerous Hell's Angels club houses. Hoecherl called Moran at –1193 on that day, expressing concern about her own home being raided. She noted that she had tried to call him earlier on his cellular telephone (–2285) but did not get through. Also on that day Moran made an outgoing call from –1193 to a "Joe" regarding the raids that had occurred in Arizona. Moran left a message requesting a call back on his cell phone.

On June 30, 2003, Heine placed a telephone call to –1193. Upon reaching Cochis, Heine asked her: "does he (Moran) have something?" Cochis responded: "yeah, he should be here in about an hour and a half." Within about two minutes Cochis phoned Moran's cell phone (–2285) and left a message for Moran to contact Heine. Based upon his training and experience, Jecko opined that Heine was calling Moran's residence and using encrypted coded language to inquire about the possession and possible sale of methamphetamine.

On June 26, 2003, Hartery called –1193. Cochis told him that Moran was on his way to Albany. Hartery replied: "I'll get him in his truck." About twenty minutes later Moran called Cochis from –2285 and she asked him if Hartery had gotten through to him. He replied that his phone had been turned off. She told him to give Hartery a call.

Numerous calls on –1193 were intercepted that indicated Moran held some authority with members of Hell's Angels and possibly within the Hell's Angels organization. Heffner, Bugsy Moran, Lashway, and Heine (all Hell's Angels) showed respect for and deference toward Moran during such calls. The first call made from Arizona regarding the raids on various Hell's Angels club houses appeared to have been to Moran. He then disseminated the information to Bugsy Moran, Heffner, Lashway, and Heine. Moran's place in the hierarchy of the alleged methamphetamine conspiracy became questionable. Therefore, Jecko opined, interception of Moran's cellular communications would help establish the organization and Moran's place in it.

Jecko further noted that future traditional investigative techniques would not yield the needed evidence. Placing an undercover officer would not be successful because Moran is familiar with local undercover police officers and Moran would not sell to someone with whom he was not familiar. It would also be impossible to introduce an undercover agent into the

Hell's Angels organization. Jecko concluded that Moran used his cellular telephone (–1185) to communicate with members of Hell's Angels for purposes that further the possession and distribution of methamphetamine.

Based upon the foregoing facts in support of the June 16 Warrant and, in addition, the facts gleaned from the calls on – 1193 intercepted pursuant to the June 16 Warrant as set forth in Jecko's affidavit and the transcripts, on July 15, 2003, Judge Donalty issued another eavesdropping warrant, for the –2285 cellular telephone line ("July 15 Warrant"). In addition to intercepting and recording telephonic and electronic communications on – 2285, the July 15 Warrant authorized pen register and caller identification devices to be installed. The July 15 Warrant was to expire after thirty days.

The July 15 Warrant was amended on July 17, 2003. The amendment permitted interception of all communications to and from –2285, including communications made through Nextel Communications, Inc.'s Direct Connect/Dispatch, text messaging, and short messaging services (collectively "Nextel Direct Services"). These services permit communication with other Nextel subscribers without dialing the telephone.

### D. Extension of June 16 Warrant (–1193)

On July 21, 2003, the Oneida County District Attorney applied for an extension of the June 16 Warrant. The purpose of the extension was to secure evidence of controlled substances crimes by Moran, Cochis, Heffner, Bugsy Moran, Lashway, Heine, Hartery, and other as yet unknown co-conspirators. Conversations intercepted as a result of the extension would purportedly deal with the sale of methamphetamine to the public; ordering and delivery times of methamphetamine; and distribution times from the Hawkins Corners residence and the known co-conspirators. Intercepted conversations would also purportedly disclose the identities of other participants; the location of the source of the methamphetamine; the monetary trail of the proceeds; and the hierarchy of the conspirators. All of the submissions supporting the June 16 Warrant were submitted for consideration of the extension application. The following facts regarding the continuing investigation were set forth by Jecko in an affidavit submitted in support of the application.[2]

On July 12, 2003, Moran took a commercial flight from Syracuse, New York, to Phoenix, Arizona. He took the airport shuttle to the Hilton Hotel. A female picked him up at the hotel and drove him to a local residence. A third party arrived with a duffle bag, stayed a short time, and left without the duffle bag. The female then drove Moran back to the Hilton Hotel. He purchased a return ticket (Phoenix to Syracuse with a stop in Pittsburgh, Pennsylvania) from priceline.com. Drug Enforcement Agency ("DEA") agents took the same flight. Moran arrived in Syracuse on July 13, 2003. A City of Syracuse police K–9 alerted on his luggage (indicating the presence of illegal substances), but declined to pursue an interdiction at that time in order to further the overall investigation.

Moran returned to the Hawkins Corners residence. On July 14 Lashway, a Hell's Angel, along with Hell's Angels prospects David Lust ("Lust") and Paul Cunningham ("Cunningham"), were observed by surveil-

---

**2.** It is noted that the complete affidavit was not included with any parties' submissions. The following facts are gleaned from the memoranda of the parties.

lance at Moran's residence. Surveillance was conducted throughout the evening. At one point Lashway's motorcycle was pulled into the garage. Lust departed in the late evening. In the morning of July 15, Lashway and Cunningham departed the Hawkins Corners residence. Surveillance placed them meeting Lust at the New York State Thruway ("Thruway") near the Little Falls exit. Surveillance continued east on the Thruway to Troy. Eventually Lust and Lashway arrived at the Troy Hell's Angels club house.

Intercepted call # 1929 between Moran and Cochis revealed that Moran had money for Heine. On July 15, 2003, Moran drove to the New York City area to meet Heine. In another intercepted call Moran asked Cochis if his package was received, and stated he hoped the package was not light. Jecko opined that Moran was concerned about the package not containing enough product, specifically methamphetamine.

Another intercepted call between Cochis and Moran occurred when Cochis borrowed Moran's truck. Moran told Cochis that there was enough "shit" in the vehicle to put her away for life. Jecko opined that Moran was talking about his vehicle containing a large amount of an illegal substance.

Jecko stated that probable cause existed to believe that eight named persons, members or prospects of Hell's Angels, were co-conspirators with Moran. However, Moran's position within the Hell's Angels was as yet unknown. Jecko reiterated the deference and respect shown to Moran by members and prospects of Hell's Angels during intercepted –1193 calls.

### E. *August 1, 2003, Eavesdropping Warrant*

On July 30, 2003, Deputy Attorney General in Charge of the New York Attorney General's Statewide Organized Crime Task Force J. Christopher Prather ("Prather") applied for an eavesdropping warrant of cellular telephone 518–858–9967 ("Lashway's cell phone"). The stated purpose of the warrant was to secure evidence of narcotics trafficking offenses by Moran, Lashway, Cochis, Cunningham, Heffner, and Lust. Interception of calls from Lashway's cell phone would purportedly reveal to whom Lashway was distributing methamphetamine, his illegal activities in conjunction with Cunningham, Lust, Heffner, and other Hell's Angels and prospects, and evidence relating to his distribution of cocaine. In addition to the affidavit of Assistant Deputy Attorney General James J. Mindell ("Mindell"), Prather submitted the affidavit of Tomasone dated July 30, 2003, in support of the application for an eavesdropping warrant. The following facts in support of the application were set forth by Tomasone.

In May 2003, an informant reported to the DEA that one Samuel Galluzzo told the informant that he drove Lashway weekly to Utica, New York, and locations in Vermont where Lashway distributes large amounts of methamphetamine. Although this informant had not previously provided information to law enforcement, portions of the information given regarding Lashway distributing methamphetamine had been corroborated.

In June 2003 a different informant provided information, corroborated by the FBI, to the FBI that one Brian Moulton ("Moulton") sold cocaine for Lashway. The informant stated that Moulton sold cocaine in quantities of three ounces or more from the Nature's Pub (also known as Adam's Rib) in Troy. The informant also stated that Moulton steals motorcycles on behalf of Hell's Angels. Moulton provided this information by statements to the informant. This informant has worked

with the FBI in the past and some of the information tended to be corroborated by Lashway's cell phone records.

Tomasone related some investigation results linking Moran with methamphetamine distribution, such as a controlled buy from Cochis at the Hawkins Corners residence. Tomasone then proceeded to set forth facts linking Lashway to Moran and methamphetamine distribution.

On June 25, 2003, three calls were made between Moran and Lashway (on his cell phone), while Lashway was attempting to locate the Hawkins Corners residence. In one call Lashway stated that he was on his way and Moran replied yeah, it's here. Tomasone opined that they were discussing methamphetamine. Within two days of these calls law enforcement surveillance observed Heffner, Bugsy Moran, and Kyle NcNeil ("McNeil"), a Troy Hell's Angel, at the Hawkins Corners residence. Tomasone opined that they were at Moran's house in order to either obtain methamphetamine or provide money with which Moran would purchase methamphetamine for them.

On July 12, Moran went to Arizona and returned the following day. Details of this trip, as well as Moran's visitors recently afterward, are set forth above. Those facts are repeated only insofar as they relate to Lashway, whose cellular telephone is the subject of the August 1 Warrant.

On July 14, Lashway's motorcycle (registered to Diane Kehn) was observed at the Hawkins Corners residence along with Lust's and Cunningham's motorcycles. At 11:22 a.m. on July 15, Lashway and Cunningham were observed traveling east on the Thruway. They met Lust at 12:11 and proceeded east. Lashway and Lust were observed arriving at the Troy Hell's Angels club house later in the afternoon. Cunningham arrived shortly thereafter.

The next day, July 16, a call between Moran and Cochis was intercepted during which they discussed arrival of a package for Moran. Tomasone related specifics about a conversation on July 17 between Moran and Cochis which indicated to him that Moran had a significant quantity of methamphetamine in the glove box of his truck.

On July 19, a call was intercepted during which Lashway told Moran he was coming up. Moran jokingly responded we're closed. He then said come on up. About two hours later Lashway was observed to arrive at the Hawkins Corners residence. Tomasone opined that Moran went to Arizona on July 12, paid for a quantity of methamphetamine, received some methamphetamine, and shipped some to New York State via the United States mail or a private carrier. He opined that the July 17 call regarding the truck glove box indicated that Moran's package of methamphetamine had arrived from Arizona.

Call detail analysis of Lashway's cell phone from May 25 to June 24 showed 36 calls to Cunningham, 9 to Hunt, 6 to the Troy Hell's Angels club house, 10 to 403 Fishing Rock Road (Heffner's residence), six to Hell's Angel John MacNeil, and 18 to the Hawkins Corners residence at – 1193, as well as to various other Hell's Angels. The analysis also showed eight calls to Juan Rivera, who has a lengthy criminal record, between June 23 and June 25. Four of the calls to Juan Rivera were made before Lashway visited Moran on June 25, and 4 calls were made on June 25 after Lashway visited Moran.

Hon. Joseph C. Teresi, ("Judge Teresi"), Supreme Court Justice for the Third Judicial District, issued the eavesdropping warrant on August 1, 2003 ("August 1 Warrant"). The August 1 Warrant authorized interception of conversations on

Lashway's cell phone from August 5, 2003, to September 3, 2003.

On August 26, 2003, Prather applied for an amendment and an extension of the August 1 Warrant. In addition to seeking information regarding methamphetamine trafficking by Moran, Lashway, Cochis, Cunningham, Heffner, and Lust, the amendment application sought narcotics trafficking information about Hunt, Robert Sicley ("Sicley"), Bugsy Moran, and Hartery. Prather again supplemented his affidavit with those of Mindell and Tomasone in support of the application. In addition to interceptions of Lashway's cell phone[3] conversations, the application sought to intercept communications on the following cellular telephones: 585–370–5704 listed to Amy Warda and used by Bugsy Moran ("Bugsy Moran's cell phone"); 518–858–0957 listed to Donna Snay and used by Sicley ("Sicley's cell phone"); 518–210–3129 listed to Cunningham ("Cunningham's cell phone"); and 518–378–1621 listed to Donna Snay and used by Hunt ("Hunt's cell phone").

Mindell set forth his background and the background of the current investigation, including the prior eavesdropping warrants on –1193 and –2285 and the August 1 Warrant; the need for the interceptions; and the previous court orders to obtain pen registers on Lashway's cell phone, Cunningham's cell phone, and the telephone listed to Shayne Bazinet at 403 Fishing Rock Road (Heffner's residence). Tomasone set forth the facts upon which he based his opinion that probable cause existed to believe that evidence of methamphetamine trafficking (by Bugsy Moran, Sicley, Cunningham, Hunt, and Lashway) would be obtained in conversations intercepted pursuant to the requested amendment and extension of the August 1 Warrant, as follows. He also noted that Cochis, Heffner, Lust, and Hartery were continuing to traffic in narcotics.

Tomasone broke the facts about Bugsy Moran, Sicley, Cunningham, and Hunt into separate sections, but did not do so for Lashway since, as he noted, the facts about each of the others also applied to Lashway. Here, however, the facts are set forth chronologically.

Tomasone related that of a call detail analysis for Hunt's cell phone from June 25 to July 24 showed 3 calls to Hartery, 5 calls to Heffner, 2 to Kyle McNeil, 22 to Cunningham, 2 to Hell's Angel Teddy Baldwin, 1 to the outlaw motorcycle gang Dominion Saints, and two to Hell's Angel John "Scotty" MacNeil.

He also set forth a call detail analysis of Sicley's cell phone from June 26 to July 24. During that time he called the Nature's Pub 14 times. The Nature's Pub is the place where an informant said that Brian Moulton sold cocaine for Lashway. Sicley called Lashway's cell phone once; Albert Blowers (a Troy Hell's Angels prospect) once; and the Dominion Saints club house once.

An informant told law enforcement officers that Sicley was formerly a member of the Dominion Saints, and he had been kicked out for using crack cocaine. The informant purportedly had first hand knowledge of the activities of outlaw motorcycle gangs in the Troy area.

Tomasone repeated the mid-July occurrences. On July 12 Lashway called Moran, discussing meeting him at Heffner's. Later that day Moran flew to Arizona. He returned on July 14. Heffner's car was

---

**3.** Lashway changed his cell phone number twice after the August 1 Warrant issued. At the time of the application for an amendment and extension his cell phone number was 518–857–6942, also listed to Donna Snay.

observed at the Hawkins Corners residence that day. Three hours later the motorcycles of Lust, Cunningham, and Lashway were observed at the Hawkins Corners residence. Upon leaving the Hawkins Corners residence the next morning, Lust, Cunningham, and Lashway traveled on the Thruway, eventually arriving at the Troy Hell's Angels club house. In the next few days calls between Moran and Cochis were intercepted regarding Moran's anticipating receipt of a package and what Tomasone opined was Moran storing narcotics in the glove box of his truck. Tomasone opined that on July 12 Moran was attempting to meet with Heffner and Lashway to obtain money to finance the purchase of methamphetamine in Arizona. He opined that upon Moran's return on July 14 Moran met with Heffner, Lashway, Cunningham, and Lust to discuss distribution of methamphetamine.

On July 19, Lashway spoke with Moran on the telephone, telling him that he was coming up. Moran jokingly stated that we're closed. About two hours later Lashway arrived at the Hawkins Corners residence.

A pen register analysis of Cunningham's cell phone for August 5, 2003, to August 21, 2003, showed 15 calls to Albert Blowers, a Troy Hell's Angels prospect; 8 calls to the Troy Hell's Angels club house; 5 calls to Sicley; 12 calls to Hartery; 2 calls to David Brock, a Hell's Angel. There were also 8 calls to Hunt's residence, 1 to Hunt's tattoo parlor, and 13 to Hunt's cell phone.

From August 5 to August 11 several calls occurred between Lashway and Sicley regarding Lashway's planned trip to visit Moran. On August 11 Lashway did go to Moran's. Sicley called Lashway while he was on his way and Lashway told him he would not be back until the next day. On August 12, after visiting Moran, Lashway tried to call Sicley several times but did not reach him.

On August 15 and 16 Bugsy Moran had a series of calls with Lashway. Lashway stated that he believed Moran left, that he was in the air.

Moran flew to Arizona on August 14 and returned on August 16. On August 16 a call took place between Lashway and Moran. Also, Lashway told Cunningham in a telephone call to come up right now, he wanted to speak with him right now. Later, when Lashway and Sicley were en route to the Hawkins Corners residence, Cunningham called Lashway saying that he was in Maryland, about ten miles from the club house, and he was safe. Lashway replied that he was on his way, and Cunningham knew where he was going. Later that night Lashway and Sicley arrived at the Hawkins Corners residence, stayed about one hour, then departed for the Rochester Hell's Angels club house.

On August 17, 2003, the search warrant was executed. Moran was arrested and several ounces of methamphetamine were recovered from the Hawkins Corners residence, Heffner's residence at 403 Fishing Rock Road, and various other locations associated with Moran, the Hell's Angels, and the Highwaymen Motorcycle Club ("Highwaymen").

On August 18, Cunningham called Lashway. Cunningham talked but Lashway said nothing audible. One minute later Cunningham called Lashway using an unidentified cellular telephone. Lashway described the raid on Heffner's house and Moran's arrest, wondering if he and Cunningham would be next. Cunningham attempted to reassure Lashway, stating that when they conducted raids they executed all the warrants at the same time.

On August 18, Lashway called Kyle McNeil, who said that he had talked to

Hartery and they were working on everything. Lashway replied that he understood, and that it was hard to say anything on the phone. Kyle McNeil told Lashway to make sure somebody stayed at the club house, and that if there were important things in the paperwork in the office he might want to try to get that out. Lashway replied that he would need help with that, and Kyle McNeil referred him to Hunt. Three minutes later Lashway called Hunt and Hunt agreed to meet at the clubhouse. Tomasone opined that the purpose of the meeting was to remove any incriminating documents from the club house.

On August 19, using an unidentified telephone, Cunningham called Lashway, saying he was going to be in Baltimore, to let everyone know that, and stating that he would be doing our thing with them at one of their houses.

On August 20, Lashway called Sicley, telling Sicley to meet him at the club house. Three minutes later he repeated the call and changed the meeting place to "Foot's Garage." Eight minutes later he called Sicley again and said stay there, stay there, I'll come to you, I got them ah parts you needed.

Judge Teresi issued the amended and extended eavesdropping warrant on September 2, 2003. The warrant authorized the interception of conversations over Lashway's cell phone, Bugsy Moran's cell phone, Cunningham's cell phone, and Hunt's cell phone from September 2, 2003, through October 1, 2003.

### F. *Extension of July 15 Warrant (– 2285)*

On August 13, 2003, the Oneida County District Attorney applied for an extension of the July 15 Warrant. The purpose of the extension was to secure evidence of controlled substances crimes by Moran,

Cochis, Heffner, Lashway, Heine, Hartery, Kyle McNiel, Bugsy Moran, Cunningham, Lust, and other as yet unknown co-conspirators. Conversations intercepted as a result of the extension would purportedly reveal whether James Mathis, a known member of the Hell's Angels affiliate Highwaymen, was a participant in the methamphetamine conspiracy and the degree of his participation. Conversations to be intercepted would purportedly deal with the sale of methamphetamine to the public; ordering and delivery times of methamphetamine; and distribution times from the Hawkins Corners residence and the known co-conspirators. Intercepted conversations also would purportedly disclose the identities of other participants; the location of the source of the methamphetamine; the monetary trail of the proceeds; and the hierarchy of the conspirators. All of the submissions supporting the July 15 Warrant were submitted for consideration of the extension application.

The Oneida County District Attorney's affidavit in support states that he became aware that the DEA was conducting an investigation of individuals transporting methamphetamine from Mexico to Hell's Angels members and/or associates in Arizona. He related the contents of a July 29, 2003, intercepted call made from Moran at –2285 to James Mathis ("Mathis"), a known member of the Highwaymen. He opined that extending the July 15 Warrant would assist in determining Mathis's involvement in the conspiracy. He further stated that Bugsy Moran and Lashway (both members of Hell's Angels) communicated on numerous occasions with Moran via Nextel Direct Services.

The following facts regarding the continuing investigation were set forth by Joseph A. Lisi ("Lisi"), a Lieutenant and Investigator with the Oneida County Sheriff's Department, in an affidavit submitted

in support of the application. Lisi was in charge of the Criminal Investigation Division of the Oneida County Sheriff's Department, and was co-case agent on the wiretap involving Moran and Cochis.

Lisi reiterated that Lashway and Bugsy Moran have cellular telephones with Nextel Direct Services through which they can communicate with Moran at –2285 without dialing the telephone. On June 24, July 10, and July 11 Lashway contacted Moran at –2285 using Nextel Direct Services from cellular telephone 518–858–9967 ("–9967"). On June 29, 2003, Lashway again contacted Moran at –2285 using Nextel Direct Services from cellular telephone 518–858–2149 ("–2149"). On July 3, 2003, Lashway once again contacted Moran at –2285 via –2149. On July 4, 2003, Bugsy Moran contacted Moran at –2285 using Nextel Direct Services from cellular telephone 518–370–5704 ("–5704").

On July 25, 2003, Moran made a call from –2285 to a Kim Zamiello regarding the fact that he had been contacted by a certain person for the first time in six months. Moran said he thought the person was looking for "shit." Lisi opined that the person Moran referenced was someone seeking to obtain methamphetamine from Moran.

On July 28, 2003, Bugsy Moran contacted Moran at –2285 using Nextel Direct Services. They discussed how the charter (believed to be the Hell's Angels) needs money; that Moran owes Bugsy Moran money, which he should have by Friday; and Moran saw "brothers" (parlance used by Hell's Angels meaning other members) at a Thruway rest area. Bugsy Moran asked if anything was going on up that way. Moran responded that he is working on it.

. Lisi noted that on July 28, 2003, Moran was en route to Hartford, Connecticut to fly to Phoenix, Arizona (and that while there Moran had contact with a known methamphetamine dealer and he returned to New York the next day).

Also on July 28 Moran was contacted at –2285 by Lashway using Nextel Direct Services. They discussed whether Moran was going to go to Laconia. The Hell's Angels have a compound in Laconia, New Hampshire.

On the same day Moran talked to a "Jo" regarding his trip to Arizona. Moran told her he would need to use her truck for 4 hours while he was there. DEA agents surveilled Moran being picked up at the Phoenix airport by Jo, taken to a safe house, left after ten minutes, and returned to the airport driven by Jo. Moran did not use Jo's vehicle while he was in Arizona. Jo is a known dealer of methamphetamine that is imported from Mexico. Lisi opined that Moran asking to use Jo's truck for four hours was code for purchasing four pounds of methamphetamine.

On the next day, July 29, Moran arrived at the Hartford airport. He drove toward New York City. While driving, he called Heine from –2285 regarding meeting Heine in Queens or Manhattan. He called Heine again from –2285 inquiring whether Heine could meet him in White Plains or Port Chester, New York. Also on July 29 Moran called Mathis, a known Highwayman, from –2285.

On August 13, 2003, Judge Donalty issued the warrant extension.

### G. *Search Warrant*

On August 17, 2003, the Oneida County Sheriff's Department applied for a search warrant. The application sought a warrant authorizing the search of designated persons, places, and vehicles at any time of the day or night without giving notice ("no-knock warrant"). In support, Grogan stated that there was reasonable cause to be-

lieve that evidence of the commission of certain delineated criminal offenses may be found. He set forth his law enforcement experience and his role in the investigation at issue here. He then set forth facts to support his assertion of probable cause, based upon his personal knowledge, review of the recordings and/or transcripts of intercepted communications, interviews with other law enforcement officers participating in the investigation, and his own investigation.

Grogan first set forth background about the Hell's Angels as set forth above, such as their participation in methamphetamine distribution and use of counter-surveillance. He then stated that the June 16 Warrant and July 15 Warrant had been issued and that it had been determined that Moran was frequently traveling to Arizona to obtain large quantities of methamphetamines for distribution to Heine, Heffner, Mathis, Corigliano, Lashway, Cook, Cochis, Jeffrey Cochis ("Jeffrey"), and others yet unknown. Grogan then related the following specific facts gleaned from review of the intercepted telephone calls, his conversations with law enforcement officers as set forth, and his personal observations made during the investigation.

On June 24, 2003, Lashway contacted Cochis to obtain Moran's facsimile number at his law office. On the same date Cochis acknowledged in a telephone call that Heffner was at the Hawkins Corners residence. Also on the same day Moran called Heine and they discussed Hell's Angels, and the difficulty Heine had with his parole officer because he was wearing his gang jacket and associating with the Hell's Angels. On June 25, 2003, at 12:25 a.m. Heffner called Moran. He discussed going to Troy and then hooking up with Moran the next evening. Law enforcement officers have observed weekly member meet-

ings on Wednesdays at the Hell's Angels club house in Troy. June 25, 2003, was a Wednesday.

Also on June 25, Lashway called Moran twice for directions from the Thruway to the Hawkins Corners residence. These calls occurred in the very early morning, at about 4:00 a.m.

At about 9:00 a.m. on June 25, a call was made to –1193 from a Pete. Pete asked for Jeffrey, Roberta Cochis's son who also lived at the Hawkins Corners residence. Jeffrey answered the phone with "Tony's Pizza." Pete asked for a large pepperoni with all the fixings. They agreed to meet in twenty minutes at a specific location in Rome, New York. A law enforcement officer observed three white males, one fitting the description of Jeffrey, meeting at the specified location.

On June 26, Cochis spoke on the telephone with her sister-in-law, and said she might be by to visit later. The sister-in-law stated: "Better bring us a little crank." Grogan noted that crank is street slang for methamphetamine.

On June 27, Bugsy Moran called Moran and referred to him as the common denominator between their associates. They discussed Bugsy Moran stopping at the Hawkins Corners residence on his way to Albany. Bugsy Moran stated that he loves Moran and Moran acknowledges that he cherishes that love. Grogan noted that speaking of love is a typical manner in which members of Hell's Angels end telephone conversations.

On June 30, Heine called –1193, spoke to Cochis, and inquired if Moran has something. Cochis replied that Moran would be home in about an hour and a half. Shortly after that call, Cochis called Moran on –2285 and left him a message to call Heine. On July 1, 2003, Heffner placed a telephone call from –1193, the Hawkins

Corners residence, to Timothy Mancini, President of the Southern Tier Chapter of the Red Devils Motorcycle Club, a Hell's Angels affiliate.

An Oneida County Sheriff's Deputy observed a gold 1997 Mercury four-door car with New York registration E538JA. This vehicle was registered to Betty Gaffney, who was believed to be related to Heffner's live-in girlfriend Shayne T. Bazinet. This vehicle had been observed in excess of twenty times in the area of 403 Fishing Rock Road.

Also on July 1, Cochis told Moran that she heard a click in the telephone. Moran told her the phone is tapped and the gig is over.

On July 2, Moran told Heine that his cell phone was turned off because he did not pay the bill. He said the phone got turned back on without him paying the bill. He wondered if the "Feds" paid the bill, then said: "Thank you. I'll send the rest of the bill, too." Heine talked about a party on July 4. Moran said he would come down to save Heine the trip back and forth. Heine mentioned that Bugsy Moran was coming to the party, and Moran mentioned Hartery. Moran talked about going to New York City to see Heine because Heine could not travel to Moran's due to his parole. Heine's parole was to end on September 11, 2003.

On July 3, Moran called Cook. They discussed Heine's impatience and Moran said he was not going anywhere until he sees everyone. On July 4, at about 11:30 a.m., Moran and Cook agreed to meet at about 2:00 p.m. At about 2:15 p.m. Cook called Moran. Moran told Cook he is not leaving until the next day so there is no rush. Cook said he'd see Moran at about 6:00 p.m.

Also on July 4, Moran called Mathis and said he needs to see him first then a few other people before he goes (to Arizona). Moran said he needed to be in Hartford, Connecticut by seven o'clock and he had wanted to leave yesterday. He also said he would make it the same thing as last time, sprint down and see him (Heine) and sprint up the other way. Grogan opined that this conversation follows Moran's established pattern that he picked up money from the people that he supplied with methamphetamine before going to Arizona to replenish his supply.

At 7:25 p.m. on July 4, Moran called Cook, a member of Highwaymen, which has a club house in Utica, New York. Moran talked about getting a quicker flight in the morning. They arranged a meeting for 8:00 to 8:15 p.m. That evening, Snyder observed the following: Moran's SUV parked in front of the Highwaymen club house at 8:43 p.m., at 8:46 p.m. the SUV was no longer parked in front of the club house, at 8:53 p.m. Moran was operating the SUV fifty feet east of the club house, and then he dropped off a person wearing Highwaymen colors at the club house.

At 7:51 p.m. on July 4, Corigliano called Moran, telling him that he was on the way to the Snubbing Post Bar ("Snubbing Post"), an establishment that he owns in Rome, New York. Moran asked if he wants to swing by first. Corigliano replied that the minute he walks in the door there's usually fifteen people to—. Moran interrupted and said he had to get it first then. They discussed Moran going on vacation. Corigliano warned him that it is a bad time to travel and told Moran he could take a ride with him so he could hold off for a while. Corigliano mentioned emails he had received from Moran. Grogan opined that the cryptic mention of vacation was in reference to Moran's planned trip to Arizona to purchase methamphetamine. He further opined that Corigliano was offering

to take Moran to a local distributor of methamphetamine so that he could delay the Arizona trip. Finally, he opined that Corigliano's statement regarding fifteen people waiting for him at the Snubbing Post was a reference to people waiting to purchase methamphetamine from him.

Later on July 4 Corigliano called Moran again, asking if he would be available the next morning. Moran replied yes, he would probably be up until he leaves. Corigliano says he will see Moran in a little bit. Grogan opined that Moran's statement about being up until he leaves referred to Moran being high on methamphetamine. Corigliano called Moran yet again to let him know he was on the way to the Hawkins Corners residence.

On July 5, Cochis and Moran spoke with Hoecherl (Heine's girlfriend or wife). They discussed Hoecherl's upcoming trip to Virginia. She said she wants her Arizona residence swept for bugs and to have cameras installed before Heine returns. She told Moran about a "brother" (Hell's Angel) serving a federal sentence in Virginia who she wants him to see. Hoecherl talks about the death of Hoover, the former president of an Arizona chapter of Hell's Angels, and going to the residence of Sonny Barger, the founder of Hell's Angels and a current member of an Arizona chapter.

On July 7, Heffner called Moran and inquired if he ever got it (referring to a medical condition). Moran misunderstood and responded that he did not go yet.

On July 8, at 11:46 a.m., someone called –1193 from Arizona telephone number 602–301–1492 and left a message for Bob to give Kiki a call. At 12:11 p.m. Moran dialed 1–602–301–1492 from –1193. Moran addressed the female who answered as Jo. She told him that they hit Cave Creek and Tucson. Jo referred to another guy who may have been up there.

Moran told her he would spread the word. Grogan noted that on July 8 federal agents executed search warrants in Arizona that included a search warrant at the Cave Creek club house of the Hell's Angels. Grogan also noted that Jo is now known to be Joanne Perez Arreola ("Arreola"), the target of an unrelated investigation in Arizona. Arreola is known to be a major distributor of methamphetamine imported from Mexico.

The same day Moran called Heffner and told him about the federal raids at Hell's Angels ·club houses in Arizona. In answer to a question from Heffner, Moran mentioned Cave Creek and Tucson. Moran told Heffner to spread the word and to check with Heine. Heffner left a message for Moran to check his email.

July 11, Moran left a message for Cook that he is trying to get out of here soon, maybe tonight or tomorrow morning. On July 12, Cook called Moran and they arranged to meet.

On July 12, Corigliano called –1193 looking for Moran. He asked Cochis if Moran went on vacation and Cochis replied yes. Cochis told Corigliano she thought her leg was broken and asked if he had any valium. He said no but he did have something to relax her. Later that evening he called Cochis and told her he was on the way over and he had some plant.

On July 12, Moran flew to Arizona. His actions while in Arizona are set forth above regarding the Extension of the June 16 Warrant. Moran returned late in the evening on July 13. Law enforcement surveillance placed him about one-quarter mile from the Hawkins Corners residence at 1:15 a.m. on July 14.

On July 14 Lashway, Lust, and Cunningham visited the Hawkins Corners residence. Law enforcement surveillance also observed a 1992 Chevrolet station wagon,

New York registration CKL 1055, registered to Shayne T. Bazinet, Heffner's live-in girlfriend. This vehicle had been observed by law enforcement surveillance over thirty times in the area of 403 Fishing Rock Road.

At 10:19 a.m. on July 14, Mathis called Moran, teasing him about hoping they had fun checking Moran's luggage on his return from Arizona. Laughing, Moran said it was filled with pornography. Moran said he would go to Mathis's house after he made a court appearance. Grogan opined that before Moran's trip to Arizona, Cook provided him with money to purchase methamphetamine for the Highwaymen, and that Moran delivered methamphetamine to Mathis for the Highwaymen.

At 10:45 a.m. Cochis called Moran and told him he left his money at the house. Moran replied that it was Heine's money, and warned her not to steal it.

At 2:26 p.m. Moran called Heffner and told him to get down here. Heffner said he would see Moran in a while. At 10:55 p.m. Heffner called –1193, the Hawkins Corners residence, and asked for Lashway. Heffner asked if he was up for it tonight, but Lashway was unsure because his girlfriend Diane was with him.

On July 15, at 10:15 a.m. Lashway's girlfriend made a call from –1193, then gave the phone to Cunningham. The ensuing conversation included a discussion of purchasing grating for covering the windows of the club house, angle iron, and diamond plating. Cunningham said that the purchase could not be in his name. Grogan noted that Hell's Angels prospects, such as Cunningham, often are assigned menial tasks around the club house. Grogan also opined that this conversation shows the covert nature of Hell's Angels' behavior, and the measures they take to protect themselves from police searches, such as fortifying the Troy club house.

He further opined that a no-knock warrant was required for the Hawkins Corners residence due to the protective measures utilized by Hell's Angels and the easily disposable nature of methamphetamine.

In the early evening of July 15 Jessica Robinson ("Jessica"), a former girlfriend of Jeffrey Cochis, called –1193. Cochis told Jessica that she would trade one for one to get marijuana from her. Cochis mentioned that Lashway and his girlfriend were at the Hawkins Corners residence. Grogan opined that Cochis was talking about trading methamphetamine for marijuana.

On July 16, at 7:23 a.m. Cochis's brother called asking her if she had any eye openers. She said she had a little. He asked how she could get it to him and they agreed to meet at a convenience store about one quarter mile from the Hawkins Corners residence. Grogan opined that Cochis agreed to give her brother methamphetamine.

At 2:30 p.m. Moran left a message for Corigliano stating: What are you waiting for a formal invitation, this is it, you are formally invited to come to my house. At 3:28 p.m. Moran called Cochis and inquired if he received any packages yet. Cochis replied no, and Moran said he hoped they were not light. Cochis said she would watch out for any. Grogan opined that Moran was wondering if he had received a package of methamphetamine and hoped that the full quantity was present. At 10:07 p.m. Corigliano called Moran to say he would see him in a few minutes.

On July 17, Moran placed a call from –1193 to his cellular phone, –2285. Moran asked Cochis where she was, then told her there was "shit" in his truck and he had not been aware that she was taking his truck. He talked about her getting pulled over, and told her if the cops found that

she would go to jail for life. Grogan opined that Moran had stored methamphetamine in his truck and that there was a sufficient quantity to justify a punishment of life in prison. He opined that Moran, as a criminal defense attorney who frequently represents drug dealers, would have an awareness of the law and punishment for possessing large quantities of methamphetamine. Grogan stated that this demonstrates that Moran uses his vehicle to hide methamphetamine and that he has probable cause to believe that Moran will continue to use his vehicle to store and transport methamphetamine.

At 8:56 p.m. Moran arranged to meet Cook at a specified store in Herkimer, New York. A short time later Moran called Cook to inform him he was at the store.

On July 18, Cochis's sister-in-law called to ask if she could swing out for a buy. Cochis said yes, but they are stressing her out. Cochis asked how much, and her sister-in-law replied a twenty and have one ready.

On July 23, Moran spoke with Corigliano. Corigliano said he tried Moran at –2285 but it was out of service. Moran explained that he leaves the bill unpaid and it is about three months before they turn off service. He then pays the bill. He said he thinks the feds are paying the bill and there is a wiretap on it. Corigliano talked about a motorcycle show in Rome, New York, to be frequented by a lot of "red and white," as well as a private event at the Hell's Angels property in Laconia, New Hampshire. He told Moran that the Nomads wanted a booth at the Rome event. Grogan opined that "red and white" was a reference to Hell's Angels. He noted that the Troy Hell's Angels refer to themselves as the Nomads, and the Snubbing Post was an advertised sponsor of the Rome event. He opined that Corig-

liano had a role as an organizer of the Rome event.

On July 28, at 4:15 a.m. Mathis left a message for Moran on –2285 wondering if Moran was going to stop by. Less than an hour later Moran returned Mathis's call and told him he will be down in fifteen minutes. Grogan noted that Heine could be heard in the background.

Late in the afternoon of July 28, Moran traveled to Arizona, flying from Hartford, Connecticut. Law enforcement surveillance in Arizona observed Arreola picking Moran up at the airport. She then took him to a "safe house." The same third party female arrived as had on the trip of July 12. Moran stayed a short period of time and then was driven to a local hotel. He returned to Hartford on July 29.

Moran called Cochis to let her know he had just gotten into his car and was going to meet knucklehead. Cochis asked him, who, Pep (Heine)? Moran replied that he did not want to say that. Cochis warned Moran to be careful. Grogan opined that Moran transported methamphetamine from Arizona for delivery to Heine, and he was concerned about saying his name over the telephone in case it was tapped. Further, Moran mentioned that he just got into the car, giving probable cause to Grogan that Moran used both vehicles while engaging in methamphetamine activity.

Several calls then took place between Moran and Heine to arrange a meeting in or around New York City. Moran was upset and wanted Heine to meet him part way. Heine told him to take it easy, saying I know you're running, I'm running too. Grogan opined that based upon this conversation, Heine was superior to Moran in the organization. They finally agreed to meet at Heine's father's house, 245–85 62d Avenue, Douglaston, County of Queens, New York.

Later in the evening of July 29, Moran told Heffner he was leaving New York City. Moran said he was going straight home. Heffner asked Moran to stop at his place on the way. Moran said if he could not stop on the way, he would stop later. Heffner said if not, he would go to Moran's house.

At about 9:00 p.m. Mathis called –1193 to inquire whether Moran was home yet and to leave a message for him to call when he got in. Cochis replied that it would be four to five hours before Moran got back.

At 2:03 a.m. on July 30, 2003, Moran called Heffner and told him he had one guy at his house and when he got rid of him he would go down to Heffner's house. Heffner said he would leave the door open, and ended the call saying thanks a lot. At 2:18 a.m. Mathis called Moran on –2285, asking if Moran could stop on the way through. Moran replied that he had people waiting at his house for him. Moran told Mathis that if he was waiting on him, Moran would be over. At 4:48 a.m. Moran called Mathis and told him to come on out. Grogan noted that it appeared from this call that Moran was in Mathis's driveway and was telling Mathis to come out to his vehicle.

At 5:06 a.m. Moran left a message for Heffner that he would be up in about 15 minutes. At 5:07, Moran called Heffner again, saying he was on Herkimer Road and climbing up the hill. Heffner said he would be home and closed the conversation with come on bro, love ya man. Grogan noted that the directions relayed by Moran were consistent with a person traveling from Mathis's residence to Heffner's residence at 403 Fishing Rock Road. Grogan opined that based upon his experience, investigation, and monitoring of calls, Moran was supplying Heine, Mathis, and Heff-

ner with methamphetamine upon his return from Arizona.

Also on July 30, a Brittany Pfaff ("Brittany") called Cochis and asked if she can get anything. Cochis replied that she would try. Brittany then stated that she had to drive eight to twelve hours and she was going to be tired. Grogan opined that Brittany was attempting to purchase methamphetamine from Cochis. He noted that methamphetamine is commonly referred to as speed and is known to keep people awake for hours and even days.

Moran spoke with Hoecherl, also on July 30, about seeing law enforcement dogs at the airport the previous day and his nervousness. He told Hoecherl that the dogs smelled at him and pointed. Grogan opined that Moran was in possession of a large quantity of methamphetamine, and the dogs would alert on him advising their handlers that he was in possession of narcotics.

At 12:02 a.m. on July 31, Cochis called Brittany. Brittany asked Cochis if that was sugar because that was what it tasted like. She asked Cochis if she put it in a yucky baggie. Cochis said yes, because that was all she had. Cochis tasted hers and said it was not sweet, but kind of bitter. She then told Brittany to hang on, because the baggie she gave Brittany came from a different bigger bag. Cochis told Brittany the stuff would have her flying all over the place. She explained that the other big bag is sweeter, because he may have cut it. Brittany asked if it was cut with sugar. Cochis replied "no with the meth ah, meth . . ." She then reminded herself and Brittany that they could not talk like that over the telephone. Cochis told Brittany she gave her the stuff for Brittany going to the store for her. They joked about drug tests and not knowing anyone who does methamphetamine. Cochis then told Brittany that the stuff is

crystal meth. Brittany said she knew it and she was trying to cover.

At 3:18 p.m. that day, Moran called Cochis at –1193 and asked her if she knew where his "shit" was. Cochis checked drawers and clothes, but she could not find it. At 3:24 Cochis called Moran to tell him she could not find it. She asked whether it could be in the pool house, closet, or garage. Moran was upset. Cochis still did not find it.

At 11:40 p.m. Corigliano called Moran at –2285. Moran said he was at the office, and Corigliano said he was with Keith and they were a block away and headed there. Moran's SUV was parked at his law office at around that time. At 11:53 p.m. surveillance noted a black 2000 Ford station wagon with New York registration AYE4349 arrive at the law office. This vehicle was registered to Corigliano. At 1:27 a.m. on August 1, Moran was observed in his SUV traveling northbound after leaving his law office parking lot. At 1:36 a.m. the same vehicle entered the parking lot of the Snubbing Post. Grogan opined that Corigliano met Moran at his law office to purchase methamphetamine that Moran had transported from Arizona. He further opined that Corigliano used the 2000 Ford vehicle to transport methamphetamine.

On August 3, at 10:51 p.m. Moran called Cook, asking him how long he was good for, a long time or a short time. Cook replied a short time, but said he did not know if Moran wanted to make a visit or not. Moran said he was sort of good for the next few days. They talked about meeting Tuesday or Wednesday. Moran spoke of not going anywhere until the end of the week, but he was unsure. He also spoke about getting cheaper flights out of airports other than Syracuse.

On August 4, at 10:47 p.m., Heffner called Jeffrey to discuss his computer. Heffner told him that his email address

was bleedingeyeball@hotmail.com. Grogan noted that the investigation revealed Moran's email address to be "fuckthelaw." On August 5, Heffner called Cochis twice talking about problems with his computer and being unable to send or receive emails. He asked Cochis and Moran to come to his house to fix it because he was in a jam.

On August 7, Moran called Mathis. They talked about Heine and his son, who had been up visiting. Moran asked Mathis if he was good, bad, or indifferent. Mathis replied pretty much ready. They talked about meeting at a later time. Moran remarked it goes fast doesn't it. Moran said he was leaving soon, and they would see each other tomorrow afternoon some time. Grogan opined that the statement "are you good, bad, or indifferent" meant do you still have enough methamphetamine and the response of "I'm pretty much ready" meant he was ready for a re-supply.

On August 9, at 9:09 p.m., Corigliano called Moran and said that Cook had been trying to reach Moran but was unsuccessful. Moran asked if Cook went home or was he still at the Snubbing Post. Corigliano was unsure.

At 10:16 p.m. Moran called Mathis. Mathis related that he did not make it to the bank. Moran said it was okay, and he would see Mathis in a couple. Grogan opined that Moran was attempting to collect cash with which to purchase methamphetamine in Arizona.

At 11:55 p.m. Corigliano called Moran to tell him that his brother was there (at the Snubbing Post), and he just wanted to warn Moran. Moran stated his location, and Corigliano directed him to come on up and drive to the garage and he would open the overhead door for him. Grogan opined that Moran and Corigliano were acting in a secretive manner consistent with narcot-

ics activity. He noted that there was plenty of parking at the Snubbing Post, therefore no need for Moran to pull into the garage (except secrecy).

On August 11, Corigliano talked to Cochis, telling her that he had tried to contact Moran but was unsuccessful. Cochis said Moran was going to Lowville. Corigliano said he needed to stop over at the Hawkins, Corners residence. Grogan opined that Corigliano had to go to Moran's to drop off money that he would need on his upcoming trip to Arizona. (Moran left for Arizona three days later.)

Later that day Moran called Corigliano and asked what he was doing. Corigliano replied counting his blessings. Moran said to count some for him, and Corigliano replied that was who he was counting it for. Corigliano said he was going to the Snubbing Post and needed about twenty minutes. Moran said just to call him and he would come down. Moran said I would advise you to see me. Corigliano replied that he definitely would, and that Moran wanted to see him too. Moran replied you got that right.

Shortly after that call, Moran called Mathis, asking him if it is time to get out of here. Mathis said yes. Moran said everyone was saying the same thing. Mathis told Moran he needed to pull a little out of the bank. Moran said he had morning appointments, but wanted to leave late the next afternoon. Grogan opined that this conversation indicated that Mathis and Moran were getting low on methamphetamine and that Moran would go to Arizona soon to replenish their supply. Grogan noted that involved people commonly hide illegal drugs and proceeds of sale in various locations in their homes, garages, and other buildings on their property. They often hide drugs on their persons and in their vehicles, and use safe deposit boxes to hide the proceeds.

On August 13, at about 10:12 p.m., law enforcement surveillance observed Moran and Cook exit the Highwaymen club house in Utica. They entered Moran's vehicle and departed. At 10:22 p.m., Moran's SUV was observed parked in the area. At 10:25 p.m., Moran was observed departing alone from the area. Grogan opined that Moran was collecting cash from Cook for his upcoming trip to Arizona.

Moran was booked to fly from Syracuse to Phoenix, Arizona, via Detroit, Michigan, on August 14, 2003. He departed from Syracuse and arrived in Detroit as scheduled. However, before he departed for Phoenix, a major power outage occurred in the Northeastern United States. Moran was grounded in Detroit. He called Cochis and asked her to get him the earliest possible flight to Phoenix.

On August 16, law enforcement personnel observed Moran exit the Syracuse airport and enter his SUV, which Cochis was driving. They were observed traveling eastbound on the Thruway toward Rome. At 4:35 p.m. Moran was observed arriving at the Hawkins Corners residence. Thereafter, Moran called Heine, Lashway, Heffner, Cook, and Mathis advising them that he was home, or they could come see him. Moran told Heffner the cow's home.

Based upon the foregoing, Judge Donalty issued a no-knock search warrant permitting the search for and seizure of property unlawful to possess, or possessed for the purpose of committing or concealing the commission of an offense, and/or constituting evidence or tending to demonstrate that person(s) participated in or attempted to participate in controlled substances offenses. Generally the property sought was methamphetamine and its salts and isomers; related paraphernalia such as scales and cutting agents; financial records and safe deposit keys; prop-

erty indicating that Moran, Cochis, and Jeffrey exercise dominion or control over the Hawkins Corners residence such as keys, photographs, videotapes, and records; materials related to parcel deliveries such as receipts and packaging; clothing, documents, patches, and other indicia of membership in or association with the Hell's Angels or any other outlaw motorcycle gang; computer-related material that would corroborate or substantiate commission or attempted commission of controlled substances offenses including hardware, software, electronic media, and records or documents of access numbers, data processing literature, and any tape recording or print media that may reveal or substantiate controlled substances offenses.

The search warrant permitted the search of the Hawkins Corners residence and outbuildings; Moran's person; Cochis's person; Jeffrey's person; a gray 2001 Saturn four-door sedan with New York registration CEM9795 registered to Moran; a gray 2003 Toyota SUV with New York registration CLC7851 registered to Moran; Moran's law office in Rome, New York; Heine's residence in Douglaston, County of Queens, New York and all motorcycles located there; Heine's person; a white Dodge Intrepid with New York registration BNP2638 registered to Jerome J. Heine; The Snubbing Post Bar and outbuildings, located in Rome, New York; Corigliano's person; a black 2000 Ford Explorer with New York registration AYE4349 registered to Corigliano; the residence and outbuildings at 403 Fishing Rock Road; Heffner's person; a red and white 1992 Chevy Suburban with New York registration CKL1055 registered to Shayne T. Bazinet; a tan 1997 Mercury four-door sedan with New York registration E538JA registered to Betty R. Gaffney; a blue 1985 Harley Davidson motorcycle with New York registration 73DE64 registered to Heffner; Mathis's person; Mathis's residence and outbuildings in the Town of Whitestown, County of Oneida, New York; a gray 1993 Ford pick-up trick with New York registration 18982JK registered to Frances Mathis; the residence and outbuildings located at 309 Jones Road, Town of Columbia, County of Herkimer, New York; Cook's person; and the commercial structure and any outbuildings located at 884 Bleecker Street, City of Utica, County of Oneida, New York, know as the Highwaymen Clubhouse.

## III. STANDARDS

### A. Eavesdropping Warrants

The Omnibus Crime Control and Safe Streets Act, as amended, governs the interception of wire, oral, and electronic communication. See 18 U.S.C. §§ 2510–22. Certain designated federal officials are authorized to apply to a Federal judge for an eavesdropping warrant.[4] Id. § 2516(1). Such an order may be granted in conformi-

---

4. Certain officials such as the Attorney General and Deputy Attorney General are authorized to make the application for a warrant to be executed by the Federal Bureau of Investigation or other responsible Federal agency when evidence of the commission of certain offenses, such as those relating to enforcement of the Atomic Energy Act, dealing with restrictions on payments to labor organizations, bribery of public officials, et cetera. See § 2518(1)(a)-(p). It is unnecessary to set forth those offenses here, because no defen-

dants challenge issuance of the warrant on this basis.

Further, any attorney for the Government is authorized to apply for a warrant authorizing interception of communications by an investigator or law enforcement officer responsible for the offense investigation, when such interception may or has provided evidence of any Federal felony. Id. § 2518(3). Similarly, the violation of this section is not the basis for any of the defendants' motions.

ty with Section 2518, which sets forth the procedure for the interception of wire, oral, and electronic communication. *Id.* The principal prosecuting attorney of any State or political subdivision of a State, if authorized by State Statute to apply to a State court judge of competent jurisdiction for an eavesdropping warrant, may apply to a State judge for such a warrant, which may be granted in conformity with Section 2518.[5] *Id.* § 2516(2).

The identity of the investigator making the application and the officer authorizing the application must be set forth. 18 U.S.C. § 2518(1)(a) (2000). A full and complete statement of the facts and circumstances upon which the applicant based the justification for such an order is required. *Id.* § 2518(1)(b). The statement must include details about the offense, a particular description of where the interception is to be made, a particular description of the type of communications to be intercepted, and the identity of the person committing the offense and whose communications will be intercepted. *Id.* § 2518(1)(b)(i)-(iii).

In addition to the factual basis justifying the warrant, the application must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." *Id.* § 2518(1)(c). The time period for which the interception must be maintained and information regarding all previous applications involving the same persons, facilities, or places must be included. *Id.* § 2518(1)(d)-(e). An application for an extension of a previous order must include the results so far obtained or a reasonable explanation for why such results have not been obtained. *Id.* § 2518(1)(f). The

court may require additional material or testimony. *Id.* § 2518(2).

The court may issue an ex parte eavesdropping warrant upon a finding that there is probable cause to believe a person is committing, has committed, or is about to commit an enumerated offense; there is probable cause to believe that particular communications regarding that offense will be intercepted; "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous;" and there is probable cause to believe that the facilities or place where the interception will occur "are being used, or are about to be used in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person." *Id.* § 2518(3).

■ Probable cause with regard to a wiretap warrant is determined by the same standard as that regarding a regular search warrant—totality of the circumstances. *United States v. Diaz*, 176 F.3d 52, 110 (2d Cir.1999); *see United States v. Rowell*, 903 F.2d 899, 901 (2d Cir.1990) (citing *Illinois v. Gates*, 462 U.S. 213, 230–32, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983)). The totality of the circumstances standard applies even where "the underlying investigation leading to prosecution was conducted solely by state officials." *Rowell*, 903 F.2d at 902; *United States v. Pforzheimer*, 826 F.2d 200, 204 (2d Cir. 1987).

The order must set forth the identity of the person whose communications will be intercepted if it is known; the nature and location of the facility or place where the interception will occur; a "particular description of the type of communication sought to be intercepted, and a statement

---

**5.** Again, it is unnecessary to specify the offenses that may provide a basis for the war-
rant application, which are set forth in the statute. *See* § 2518(2).

of the particular offense to which it relates;" the agency authorized to perform the interception and the person who authorized the application; and the time period during which such interceptions are authorized. 18 U.S.C. § 2518(4). An order may not authorize interceptions for longer than is necessary to achieve the objective, and in any event no longer than thirty days. *Id.* § 2518(5). Progress reports may be required by the court. *Id.* § 2518(6).

■ An aggrieved person may move to suppress the contents of any intercepted oral or wire communication, along with the fruits of such interception. *Id.* § 2518(10)(a). A motion to suppress may be based upon the grounds that "(i) the communication was unlawfully intercepted; (ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or (iii) the interception was not made in conformity with the order of authorization or approval." *Id.* These are the only nonconstitutional bases on which such evidence may be suppressed. *Id.* § 2518(10)(c).

## B. *Search Warrant*

■ The Fourth Amendment requires that a warrant to search a place and seize a person or things must be based upon probable cause, supported by oath or affirmation. U.S. Const. amend. IV. Again, probable cause is determined by the totality of the circumstances. *Diaz*, 176 F.3d at 110.

■ There is a presumption that the affidavit supporting the search warrant application is valid. *Franks v. Delaware*, 438 U.S. 154, 171, 98 S.Ct. 2674, 2684, 57 L.Ed.2d 667 (1978). Thus, ordinarily the veracity of the underlying affidavit cannot be challenged. *See id.* at 164, 98 S.Ct. at 2681. However, the truthfulness of the factual statements set forth in a supporting affidavit may be challenged in limited circumstances. *Id.* at 155–56, 98 S.Ct. at 2676.

■ An evidentiary hearing is mandated when a "defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause." *Id.* A conclusory attack on the truthfulness of the affidavit or a "mere desire to cross-examine" are insufficient. *Id.* at 171, 98 S.Ct. at 2684. Rather, "[t]here must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof." *Id.* The challenger must "point out specifically the portion of the warrant affidavit" that is allegedly false along with "a statement of supporting reasons." *Id.* "Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient." *Id.* Only the truthfulness of the affiant may be challenged; that of a nongovernmental informant may not. *Id.*

■ Even if the preceding requirements for an offer of proof are met, no hearing is required if, when the alleged false statements are set aside, the remaining facts in the warrant affidavit are sufficient to support a finding of probable cause. *Id.* at 171–72, 98 S.Ct. at 2684. However, "if the remaining content [of the warrant affidavit] is insufficient, the defendant is entitled" to a hearing. *Id.* at 172, 98 S.Ct. at 2685. In other words, a defendant is entitled to a hearing where a substantial preliminary showing is made of the alleged falsehood, and the allegedly false material

is necessary to support a finding of probable cause. *Id.* at 155–56, 98 S.Ct. at 2676.

If, at the hearing, the defendant proves perjury or reckless disregard for the truth by a preponderance of the evidence, and when the false material is disregarded the "affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." *Id.* at 156, 98 S.Ct. at 2676. As can be seen, a challenger attacking the veracity of statements made in a warrant affidavit bears a heavy burden, in establishing entitlement first to a hearing and second to exclusion of the fruits of the search.

### C. *Probable Cause*

■ As noted above, the same probable cause standard applies to both a wiretap warrant and a regular search warrant. *Diaz*, 176 F.3d at 110. Probable cause exists where "the 'totality-of-the-circumstances' indicate a probability of criminal activity." *Id.* (quoting *Illinois v. Gates*, 462 U.S. at 230–32, 103 S.Ct. at 2328); *Rowell*, 903 F.2d at 902. The determination of probable cause turns on "the assessment of probabilities in particular factual contexts," as it is a "fluid concept . . . not readily, or even usefully, reduced to a neat set of legal rules." *Rowell*, 903 F.2d at 902. The issuing judge must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particu-

lar place." *Illinois v. Gates*, 462 U.S. at 238, 103 S.Ct. at 2332. If the issuing judge had a " 'substantial basis for . . . conclud[ing]' that a search would uncover evidence of wrongdoing" then the probable cause determination comports with the Fourth Amendment. *Id.* at 236, 103 S.Ct. at 2331 (quoting *Jones v. United States*, 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960)). On review, it is necessary only to insure that the issuing judge had a substantial basis for finding probable cause. *Id.* at 238–39, 103 S.Ct. at 2332.

## IV. *DISCUSSION*

### A. *Moran*

#### 1. *2518 (1)(c), 2518(3)(c)—Need for Wiretap*

■ Moran first argues that the warrant applications are deficient in that they include only conclusory statements as to the need for a wiretap warrant and why traditional investigative techniques will not suffice to obtain evidence of the offense.[6] A statutory requirement for a wiretap application is a detailed statement that "other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c).

More specifically, Moran argues that the warrant application sets forth conclusory statements of necessity without factual predicate. However, a careful reading of the June 16 Warrant application reveals factual statements sufficient to support the conclusion that investigative techniques other than interception of wire, oral or electronic communications would be inadequate to obtain evidence of the commission

---

**6.** Moran also argues that the telephone toll records submitted in support of the June 16 Warrant application were illegally obtained without a subpoena. The June 16 Warrant Application clearly states, however, that the toll records were obtained by subpoena, negating this argument.

of methamphetamine trafficking or be too dangerous, as well as the requisite listing of other investigative procedures that have been used. The July 15 Warrant application included all the affidavits submitted with the June 16 Warrant application. Therefore, the following analysis applies equally to both applications.

The June 16 Warrant application connects Moran and Cochis with the Hell's Angels. Grogan stated that Moran has a relationship with several Hell's Angels. He then cited a specific example, where known Hell's Angel Bugsy Moran was observed by Snyder, a state trooper, in Rome. Snyder's supporting deposition fills in details of this incident. Bugsy Moran told Snyder that he was calling a friend to get him because he could not find the friend's house. Snyder then observed a vehicle belonging to Moran arrive, which Bugsy Moran followed. Grogan also related that Moran's vehicle has been observed at the Troy Hell's Angels club house.

Jecko analyzed the telephone toll records from March 1, 2003, to April 24, 2003, from the Hawkins Corners residence, providing a further connection between Moran and the Hell's Angels. During this time calls were made from Moran's home telephone, –1193, to the telephone number 315–891–3726, listed to Shayne Bazinet, at 403 Fishing Rock Road. Two known Troy Hell's Angels, Gagnon and Heffner, reside at 403 Fishing Rock Road. Telephone number 518–273–3230, listed to Flesh Jess Tattoos, was called five times. Flesh Jess Tattoos is owned by a member of the Troy Hell's Angels. Twenty-two calls were made to 518–858–9967, listed to the girlfriend of Lashway, a known Troy Hell's Angel. Rochester Hell's Angel Bugsy Moran was called three times on his home telephone and five times on his cellular telephone. Three calls were made to the cellular telephone of Cunningham, a Troy

Hell's Angels prospect. Eleven calls were made to 518–589–0411, listed to a deceased person at a residence occupied by Hartery, a Troy Hell's Angel. A single call was made to the home of Mancini, president of the Red Devils Motorcycle Club Southern Tier, a Hell's Angels affiliate.

Tomasone conducted surveillance of Gagnon and Heffner. The telephone toll records for 315–891–3791, their residence at 403 Fishing Rock Road, showed 98 calls made to –1193, Moran's home telephone at the Hawkins Corners residence, between February 6, 2003, and April 24, 2003. The records also showed two calls to Moran's law office in Rome.

These facts demonstrate a significant connection between Moran and the Hell's Angels to permit an inference that information about the Hell's Angels may be applicable to Moran. Grogan asserts that it is well known that Hell's Angels are involved in the production and distribution of methamphetamine. As one specific incident, the Rochester Police Department reported that Hell's Angel Bugsy Moran was arrested on March 1, 2003, after he was found to be in possession of a quantity of suspected methamphetamine. Grogan also related that according to Kevin Patrick McDonough of the Middle Atlantic–Great Lakes Organized Crime Law Enforcement Network the Hell's Angels are heavily involved in methamphetamine production in Canada, which is then imported into this country. Grogan related a specific incident in April 2003 during which a Rome resident was assaulted by Hell's Angels in Rochester relating to a drug deal, which he states demonstrates the Hell's Angels' propensity toward violence and drug activity.

Grogan noted that other law enforcement officers who are pursuing investigations of the Hell's Angels advised him that Hell's Angels conduct counter surveillance.

For example they periodically photograph the surrounding area including telephone poles in order to detect changes that may indicate surveillance by law enforcement. They also use video counter surveillance equipment. Officers who had been investigating the Troy Hell's Angels club house advised Grogan that in their opinion the Hell's Angels and Moran would notice changes around the Hawkins Corners residence, including vehicles and pole cameras.

Jecko stated that historically it has been extremely difficult to infiltrate the Hell's Angels. He stated that they are highly secretive. *See Diaz,* 176 F.3d at 111 (listing the secretive nature in which a gang's illegal activities were conducted as a factor that played a role in determining that traditional techniques would not be successful). They frequently reside at locations owned or rented by others, and use other people's names to register vehicles and obtain utilities and services, in an attempt to avoid identification by law enforcement. Jecko stated that Hell's Angels often reside in rural locations, where stationery surveillance could easily be detected. They monitor police frequencies using scanners and use counter-surveillance techniques, such as periodically photographing surrounding areas in order to discover law enforcement surveillance equipment such as pole cameras. *See United States v. Miller,* 116 F.3d 641, 664 (2d Cir.1997) (listing the gang's "extensive use of bodyguards and lookouts" to insulate themselves from law enforcement as a reason that traditional techniques would be unsuccessful.) Hells Angels prospects sometimes are instructed to commit criminal acts or use narcotics as a part of their initiation. This portion of their initiation would serve to identify law enforcement agents who were attempting to infiltrate the organization, as law enforcement agents would be unable to commit criminal acts or use narcotics. *See id.* (noting as a

factor in the necessity inquiry the fact that infiltration was not a viable technique due to violent nature of gang).

Grogan opined that introducing an undercover officer into the situation would not be fruitful, because Moran, as an attorney, is familiar with most local undercover police officers. Further, the CI informed Grogan that Moran would not sell methamphetamine to someone with whom he was unfamiliar. Grogan noted that his CI was not in a position to infiltrate the upper echelon of the organization, and that it would be impossible to infiltrate the Hell's Angels with an undercover police officer. *See United States v. Young,* 822 F.2d 1234, 1237 (2d Cir.1987) (noting that there was no confidential informant available to infiltrate the conspiracy); *see also Miller,* 116 F.3d at 664 (noting that eavesdropping warrant may be necessary where the organization could not be infiltrated and investigators had yet to identify the upper and middle level managers).

These specific facts set forth in the application for the June 16 Warrant demonstrate that normal investigative techniques would reasonably appear to be unlikely to succeed.

Two bases in support of the dangerousness of traditional investigative techniques are also set forth. As noted above, the application also sets forth an assault by the Hell's Angels against a Rome resident as a result of a money shortage on a drug deal. Also, the CI testified that s/he feared for his/her life if the Hell's Angels found out. The CI also testified that some Hell's Angels wear a special pin, as a type of badge of honor for having killed someone.

In addition to the factual predicates for the conclusion that other investigative techniques would not be successful or would be too dangerous, as set forth above,

facts are set forth regarding the techniques that have been used, along with the degree of success achieved. Grogan related how he had developed a CI and arranged a controlled purchase of methamphetamine from Cochis at the Hawkins Corners residence. Surveillance by law enforcement officers connected Moran with Bugsy Moran and the Troy Hell's Angels. Grogan stated that his surveillance attempts of the Hawkins Corners residence were unsuccessful because it was at an intersection in a residential neighborhood and surveillance would be detected, although he drove by the residence numerous times. *See Young,* 822 F.2d at 1237 (noting that surveillance of residence in a residential neighborhood would be unlikely to succeed because officers would be noticed). Jecko obtained the telephone toll records for the telephone at the Hawkins Corners residence. His analysis of the records indicated a connection with known Hell's Angels, because very numerous calls were made to known Hell's Angels.

Tomasone conducted surveillance at the Troy Hell's Angels club house. This led to the discovery of the residence at 403 Fishing Rock Road of two Troy Hell's Angels, Gagnon and Heffner. Further surveillance of the 403 Fishing Rock Road residence would be been difficult because of the rural location. Analysis of the telephone toll records for the 403 Fishing Rock Road residence revealed, inter alia, 98 calls to Moran's home telephone, –1193.

Between the toll record analysis of the –1193 line and the 403 Fishing Rock Road telephone, an extremely high number of calls were made between Moran (or someone using his residence telephone) and the telephones of known Hell's Angels. Since Hell's Angels were known to be methamphetamine traffickers, it could be inferred that Moran's home telephone –1193 was frequently used to conduct narcotics traf-

ficking. *See United States v. Hoey,* No. 91–CR–207, 1991 WL 239946, at *8 (N.D.N.Y. Nov.14, 1991) (noting that a wiretap is "particularly appropriate" where the phone was routinely used in the illegal conduct).

Moran cites *United States v. Giordano,* 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974); *United States v. Ippolito,* 774 F.2d 1482 (9th Cir.1985); and *United States v. Lilla,* 699 F.2d 99 (2d Cir.1983), in support of his argument that insufficient factual predicates were set forth in the warrant applications at issue here. However, none of the situations in these cases is comparable to that presented in this case.

First, in *Giordano,* the issue was whether an application not authorized by "the Attorney General or an Assistant Attorney General specially designated by him," as stated in 18 U.S.C. § 2515, must be suppressed under 18 U.S.C. § 2518(10)(a). 416 U.S. at 508, 94 S.Ct. at 1823. The Court did note that wiretaps "were not to be routinely employed as the initial step in the investigation." *Id.* at 515, 94 S.Ct. at 1827. However, its finding that the approval of an application by an authorized Department of Justice official was a statutory prerequisite subject to a motion to suppress, *id.* at 528, 94 S.Ct. at 1832, is inapposite here.

In *Ippolito,* the factual circumstance cannot in any way be equated with the situation here. There, a confidential informant told FBI agents he would not testify because he feared Ippolito. 774 F.2d at 1484. However, another agent had told the confidential informant to make that statement, so his refusal to testify could be used to demonstrate the necessity required to obtain an eavesdropping warrant. *Id.* Additionally, it was established at the suppression hearing that the confidential informant "was willing and probably able to infiltrate the entire California

conspiracy." *Id.* The confidential informant was willing to have his conversations monitored, and draw conspirators into the open so they could be brought under surveillance. *Id.* Thus, in *Ippolito,* the facts actually established that conventional investigatory techniques, such as infiltrating the organization and physical surveillance, could have been undertaken with some modicum of success.[7] *See id.* at 1486. Here the applications pointed out the impossibility of the confidential informant getting involved with upper echelons of the organization, and the difficulties of conducting physical surveillance.

Finally, in *Lilla,* an investigator listened in on a conversation between an informant and Lilla. 699 F.2d at 100. They discussed "flake" (cocaine) and "lumbo" (marijuana), and "further conversation was to the effect that Lilla would sell 'a whole one' for $475." *Id.* at 100–01. The informant took the investigator to Lilla's workplace, where he paid $475 for a pound of marijuana. *Id.* at 101. Lilla related that the marijuana, and cocaine, would be available in a week or two when his brother brought it up from Florida. *Id.* Lilla gave the investigator his home and work telephone numbers. *Id.* The affidavit in support of the warrant application set forth these facts, then concluded that no other investigative method existed to determine the other persons involved in the conspiracy and to obtain evidence. *Id.* The court found that rather than set forth the other investigative procedures that were unlikely to succeed, the application set forth successful investigative techniques. *Id.* at 104. It noted that "there is no indication why simple surveillance of Lilla's place of work or his home would not have been

useful . . . [and it] does not enlighten us as to why this narcotics case presented problems different from any other small-time narcotics case." *Id.*

Here, numerous reasons were set forth why physical surveillance would not be successful: it was likely to be detected at the Hawkins Corners residence (because of the residential location); at the Troy Hell's Angels club house (counter surveillance techniques likely in use); and at the residences of Gagnon and Heffner (because of the rural location of 403 Fishing Rock Road). The applications also set forth how this case differs from "any other small-time narcotics case": Hell's Angels, known traffickers of methamphetamine throughout the United States and Canada, were believed to be engaged with Moran in the conspiracy. Accordingly, *Lilla* does not help Moran's argument.

▮▮ In sum, the eavesdropping warrant applications did contain a detailed factual explanation of the traditional investigative techniques that were used, including a confidential informant and controlled narcotics purchase, physical surveillance, and telephone toll record analysis. The applications explained how traditional techniques would likely be unsuccessful as well as likely to be too dangerous. No specific traditional investigative techniques must be tried, and fail, prior to issuing an eavesdropping warrant. *Miller,* 116 F.3d at 663. Further, it is unnecessary to exhaust all traditional law enforcement investigative techniques prior to applying for a wiretap warrant. *Diaz,* 176 F.3d at 111. The warrant applications for the June 16

---

7. The *Ippolito* Court reasoned that the necessity requirement was material to the issuance of the eavesdropping order. *Id.* at 1485. If therefore applied the *Franks* analysis, deleting the false material from the application and concluding that "a reasonable district court judge could have denied the application because necessity for the wiretap order had not been shown." *Id.* at 1486–87.

Warrant and the July 15 Warrant met the statutory necessity requirement.

 Since the original warrant applications met the statutory necessity requirement, Moran's argument that the extension and amendment applications relied upon non-compliant prior applications necessarily fails. Moran further argues the amendment applications fail to meet the necessity requirement and that the July 21 and August 13 extension applications are completely devoid of any statement of necessity. The amendment applications of June 24 and July 17 requested technical amendments such as changing the designation authorization to execute the warrant. The statute permits modification of the order by the issuing judge, see 18 U.S.C. § 2518(3), and Moran has cited no authority for the proposition that an application for a technical modification to the warrant requires repetition of the statutory application requirements.

The extension applications incorporate the initial warrant applications and reference the affidavits in support to establish the background facts upon which the conclusion is made that normal investigative procedures are unlikely to succeed if attempted and would jeopardize the investigation and the life of the CI. In addition to the previously submitted information, the August 13 extension application relies upon the affidavit of Lisi and the transcripts of intercepted calls from –1193 and –2285. Lisi set forth facts indicating the continued involvement between Moran and Hell's Angels. He opined that Moran's activities were "part and parcel" of the activities of the Hell's Angels. He also stated that law enforcement surveillance was arranged during Moran's one-day stay in Arizona. Thus, the extension application connects the previous predicate facts relating to necessity to the time period when the extension was being requested.

This combination is sufficient to constitute the required "full and complete statement" of necessity in the application. See 18 U.S.C. § 2518(1)(c), (5); see also United States v. Terry, 702 F.2d 299, 310 (2d Cir.1983) (finding that where "the factual justification for the [wiretap] order had not changed at the time when an extension was sought, it was unnecessary to vary the specific facts ... in the renewal application").

Accordingly, the June 16 Warrant and July 15 Warrant applications, the June 24 and July 17 applications for amendments, and the July 21 and August 13 extension applications meet the statutory requirements of setting forth what "other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." See 18 U.S.C. § 2518(1)(c).

### 2. Misstatements and Omissions— Wiretap Applications

 Moran argues that certain misstatements and omissions in the warrant applications concerning the necessity requirement and regarding the finding of probable cause requires suppression, or at the least a Franks hearing. Whether misstatements and omissions affected the finding of probable cause is subject to the Franks analysis. See Franks, 438 U.S. at 171–72, 98 S.Ct. at 2684–85. The necessity requirement is also subject to the Franks analysis for challenging the veracity of affidavits supporting the wiretap application. Ippolito, 774 F.2d at 1485. Determination of materiality is the first step in the analysis. Id. Thus, in order to determine whether the misstatement or omission was material to the finding of necessity, the "hypothetical effect" on the original determination must be considered. Id. at 1485–86.

Moran argues that the June 16 Warrant application omitted information about the FBI in order to mislead the issuing court into believing that none of the intercepted conversations would be privileged conversations between attorney and client. He contends that the FBI was involved from the beginning of the investigation, and the amendment of June 24 was a "slight-of-hand" that was "deliberately designed and [ ]successfully orchestrated" to mislead the court. (Mulroy Aff. 3–13–04 ¶ 42.) Moran contends that he represented Heffner, Lashway, Heine, Hartery, Bugsy Moran, Jesse Hunt, and Lust, in various courts. However, each of the applications clearly states that none of the conversations to be intercepted were expected to be privileged, and if any privileged conversations were intercepted, such interception would be immediately suspended. Moreover, Moran fails to establish how omitting the FBI (as an agency authorized to carry out the court-ordered wiretap) from the June 16 Warrant implicates the applicants for misleading the issuing court. Clearly the applications, amendments, and extensions were sought to obtain further evidence of methamphetamine possession and distribution by named and unknown conspirators. Any conversations intercepted regarding these topics would not be privileged. Moran has not established that any misstatements or omissions were made regarding privileged conversations.

Moran argues, with regard to the July 15 Warrant application, that traditional investigative techniques were used, and in fact, were successful. Accordingly, he contends that the statements in the eavesdropping warrant application to the opposite were misstatements material to the finding of necessity. Moran cites the successful surveillance of his person, the Hawkins Corners residence, visitors at the residence; use of confidential informants to make several controlled buys from Cochis;

use of drug sniffing dogs; inspection of his luggage; use of telephone pole cameras in front of the Hawkins Corners residence; and use of a Global Positioning System ("GPS") to track his vehicle. As set forth above, the applications for both eavesdropping warrants set forth various instances where information regarding Moran, the Hawkins Corners residence, and visitors to the Hawkins Corners residence was obtained by use of traditional physical surveillance. Moreover, the applications set forth the limited success of the physical surveillance and stated reasons, such as the residential location of the Hawkins Corners residence and potential use of counter surveillance for detection, why traditional surveillance would not be sufficient to obtain evidence of the commission of controlled substances offenses and conspiracy to commit such offenses by the named targets of investigation. The warrant applications also set forth information regarding the use of the CI and the controlled buy. Further information before Judge Donalty indicated a second, failed, attempt by the CI to make a controlled purchase from Cochis. There was no misstatement in the warrant application regarding the CI.

Moran contends that misstatements or omissions were made regarding the use of drug sniffing dogs and inspections of his luggage. However, the application for an extension of the June 16 Warrant, made on July 21, 2003, clearly relates the information about Moran's trip to Arizona on July 12, 2003. DEA agents took the same flight from Phoenix to Syracuse (via Pittsburgh) that Moran took on July 13. The extension application further relates that a City of Syracuse police K–9 drug sniffing dog alerted on Moran's luggage, but no interception was made in the interest of furthering the investigation. There was

no misstatement regarding luggage inspection and use of a drug sniffing dog.

 Although Moran argues that the warrant applications failed to include information about the use of pole cameras to surveil the Hawkins Corners residence and a GPS tracking device on his vehicle, there is no proffer to establish that the omission of such information was knowing, intentional, or with reckless disregard of the truth. *See Franks*, 438 U.S. at 156, 98 S.Ct. at 2676. Further, even it was established that such omission was knowing or intentional, neither bit of information was necessary to the finding of necessity. *See id.* The July 15 Warrant application contained sufficient facts to establish the need for the eavesdropping warrant on the –2285 cellular telephone even if Moran established that pole cameras were used to surveil the Hawkins Corners residence and if the information gleaned from the GPS device had been revealed.

Thus, the statement of necessity was not a "misstatement" as Moran suggests, nor was there insufficient evidence to support a finding of necessity even considering the facts Moran suggests were omitted. *See United States v. Sanchez–Flores*, No. 94 CR 864(JFK), 1995 WL 765562, at *2–3 (S.D.N.Y. Dec.29, 1995) (upholding issuance of wiretap warrant against "misstatement" challenge where application described limited success of traditional investigatory techniques and the issuing judge concluded that "a wiretap would substantially advance the investigation beyond limited parameters and expose additional participants and methods of the conspiracy").

 In addition to making this argument with regard to necessity, Moran also argues that material misstatements and omissions regarding the finding of probable cause require, at the least, a *Franks* hearing. Moran first points to the intercepted telephone calls from –1193 during which known members of Hell's Angels were allegedly told to call Moran on his cellular telephone, contending that no such conversations took place. Although Jecko initially states that on numerous occasions Hell's Angels attempts to contact Moran at –1193 were met with the direction to contact him on his cellular telephone (–2285), he goes on to enumerate such occasions as well as other references regarding contacts via –2285. For example, on July 8, 2003, Hoecherl discussed police raids of Hell's Angels' club houses in Arizona on line –1193, but referenced attempts to have contacted Moran on –2285. On the same day Moran called "Joe" in Arizona regarding the raids and asked for a return call on –2285. On June 30, Heine called –1193 to speak with Moran and Cochis immediately called –2285, telling Moran to call Heine. Thus, the statement about Moran using his cellular telephone, –2285, at the least to hold conversations with Hell's Angels, and the opinion that such conversations concerned Hell's Angels' business and possibly methamphetamine trafficking, was not misleading and therefore had no effect on the finding of probable cause.

Moran further cites a telephone call on June 30 (call # 771) during which Heine asked Cochis if Moran "had something." Cochis replied that "he should be here in an hour and a half." Jecko opined that the conversation was in coded language regarding the possession and possible sale of methamphetamine by Moran. Moran contends that during call # 771 Heine never asked if Moran "had something." Rather, the part of the conversation transcribed by law enforcement as "does he have something" was actually "to the house I mean," according to Moran. Moran argues that nothing in the conversation could be construed as related to drug-trafficking.

Even if the transcription is inaccurate, and the inaccuracy was intentionally made to deceive the court, there is no showing that this intercepted call was necessary to the finding of probable cause. *See Franks,* 438 U.S. at 156, 98 S.Ct. at 2676. Moran makes similar arguments regarding additional telephone calls, such as one with Hartery regarding an upcoming federal court discovery issue, one between Cochis and her grandson, an almost hour-long call with Hoerchel, a call purportedly regarding delivery of a pool light, and a call which purportedly evidenced Moran owing money to Bugsy Moran. Again, even if each of the conversations alleged to be non-drug-trafficking related, Moran has not established that there was an intent to deceive the court, or that these calls were necessary to the finding of probable cause. To the contrary, none of the conversations, either separately or as a whole, is essential to the finding of probable cause and therefore Moran has not established entitlement to a *Franks* hearing.

### 3. *18 U.S.C. § 2518(5)—Minimization*

■■■■ Moran argues that all of the evidence obtained from the eavesdropping warrants of both –1193 and –2285 must be suppressed because the law enforcement officers that executed the warrants failed to properly minimize the interception of communications, such as those governed by the attorney-client privilege, that were not subject to interception. An order authorizing a wiretap interception must require that the intercept "be conducted in such as way as to minimize the interception of communications not otherwise subject to interception under this chapter." 18 U.S.C. § 2518(5). Whether the intercept was conducted in a manner to minimize unauthorized interceptions must be determined objectively. *Scott v. United States,* 436 U.S. 128, 137–38, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1978). Thus, the

minimization inquiry turns on the "objective reasonableness without regard to the underlying intent or motivation" of the law enforcement officers conducting the intercept. *Id.* at 138, 98 S.Ct. at 1723. Factors to consider in determining whether the intercepts were objectively reasonable include the focus of the investigation (widespread or narrow); the normal usage of the telephone; and the time during the authorized period when the nonrelevant calls were intercepted. *Id.* at 140, 98 S.Ct. at 1725. Also pertinent but not dispositive is the number of non-relevant calls compared to the total number of intercepted calls. *Id.,* 98 S.Ct. at 1724. "The Government bears the initial burden of establishing that minimization requirements have been met." *United States v. Gotti,* 42 F.Supp.2d 252, 268 (S.D.N.Y.1999) (citing *United States v. Cirillo,* 499 F.2d 872, 880–81 (2d Cir.1974)).

Moran lists numerous conversations that he contends were not pertinent to the investigation that were not minimized or were insufficiently minimized. For example, there were conversations between Cochis/Moran and her four-year-old grandson, Moran and several clients, Moran and his law practice secretary, and Moran and other family members. Here the government maintained logs of the intercepted calls, made progress reports to the issuing judge, maintained supervision of the interceptions by the responsible assistant district attorney, required all law enforcement officers participating in the interceptions to read minimization instructions, and posted the minimization instructions at the monitoring plant. (McNamara Aff., Moran Ex. E ¶¶ 80–81.); *see Gotti,* 42 F.Supp.2d at 268 (identifying monitoring logs, judicial supervision of progress; supervision by the prosecutor; requiring monitoring personnel to read instructions, court order, and applications;

and posting these documents at the monitoring locations as indicia of compliance with minimization requirement). Thus, the government has established that it complied with the minimization requirements. *See Gotti,* 42 F.Supp.2d at 268–69. Further, the investigation involved members of Hell's Angels, some of whom were Moran's clients, such that intercepted conversations would require a sufficient monitoring time to determine if drug trafficking was the subject of the telephone call. The initial telephone log review indicated a very high number of calls between –1193 and members of Hell's Angels (for example, 98 calls were made from the 409 Fishing Rock Road telephone to the Hawkins Corners residence in about two and a half months), indicating that the –1193 telephone was being used for business other than Moran's law practice. Moreover, Moran complains of the improper minimization of only twenty-five calls, out of approximately 5,000 interceptions that were made in the course of the wiretap investigation. Accordingly, viewing the facts and circumstances objectively, the interceptions and minimization procedures were reasonable. *See Scott,* 436 U.S. at 140–42, 98 S.Ct. at 1724–26. Moran is not entitled to suppression or a hearing on the minimization issue.

### 4. *Search Warrant*

██ Moran seeks the suppression of all physical evidence obtained from searches of his person, his vehicles, the Hawkins Corners residence, and his law office. He contends that the warrant application was invalid because it combined the items to be seized from seven individual persons, eight buildings, and eight vehicles, making it impossible to determine the specific property to be seized, or what could reasonably found, at each designated location.

The search warrant specifically delineated the property to be seized: methamphetamine in any form, materials used in the distribution of narcotics (scales, plastic bags, etc.), documents (such as bank accounts and personal papers) evidencing drug trafficking, clothing or other gang-related items, and computer material evidencing narcotics trafficking. Details of the investigation leading to the application for the search warrant were included. For example, telephone conversations that were intercepted pursuant to the wiretap warrants were set forth, including numerous conversations between Moran and Hell's Angels throughout the time period that the wiretaps were authorized. More particularly, conversations were set forth indicating that Moran collected sums of money from co-conspirators just prior to making a short trip to Arizona, then met with those co-conspirators soon after his return. Moran made three such trips to Arizona during the two-month pendency of the wiretap investigation. These conversations were held on –1193, the telephone at the Hawkins Corners residence, and –2285, the cellular telephone registered to Moran's law office. Many of the –2285 conversations occurred while Moran was in either of his vehicles, the Satum or the Toyota SUV. At least two conversations between Moran and Cochis indicated that methamphetamine was located in the SUV and the Hawkins Corners residence. Telephone conversations on –1193 were also intercepted indicating Cochis distributed methamphetamine and purchased other illegal substances such as marijuana (or traded methamphetamine for them) at the Hawkins Corners residence.

In addition to intercepted conversations, physical surveillance placed known Hell's Angels or prospects at the Hawkins Corners residence within a short period of time after Moran returned from an Arizona trip. Also, one day after Moran re-

turned from a trip to Arizona he met with Corigliano at his law office and then proceeded to the Snubbing Post.

Given these and all the other details set forth in the search warrant application, Judge Donalty had a substantial basis for finding probable cause that contraband or other evidence of methamphetamine trafficking would be found upon Moran's person, in the Hawkins Corners residence, in Moran's vehicles, and in his law office.

■■■ Moran also seeks suppression of the seized rifle, which was wrapped in plastic and partially wrapped inside a blanket, contending that firearms were not listed specifically in the warrant as items to be seized and it could not be determined from a visual, cursory inspection that the seized rifle was illegal. To the contrary, it was immediately apparent to the investigator who recovered it that a long gun was contained within. The investigator was lawfully searching the residence pursuant to the valid search warrant, and had reason to believe that it was unlawfully possessed by a convicted felon.[8] Accordingly, the weapon was properly seized under the plain view doctrine. *See People v. Brown,* 96 N.Y.2d 80, 83, 89–90, 725 N.Y.S.2d 601, 749 N.E.2d 170 (N.Y.Ct.App.2001) (semi-automatic revolver wrapped in plastic inside a floor vent within plain view).

### 5. *Miscellaneous Motions*

■■■ Moran seeks disclosure of the grand jury minutes. Moran cites no case law in support of his request. Rather, he contends that the material is needed to properly prepare the case and due to the alleged material misrepresentations of fact presented to Judge Donalty in the wiretap and search warrant applications. He also moves to dismiss the indictment based upon "prejudicial, conclusory, and misleading testimony" presented to the grand jury. As previously noted, the alleged misstatements upon which Moran relies were not misstatements at all. Accordingly, they provide no basis for ordering disclosure of the grand jury minutes or for dismissing the indictment.

■■■ Moran also seeks an inventory of seized items and return of property. He also requests discovery and inspection of certain items. According to the government, an inventory of all items seized as a result of the execution of the search warrant has been provided. The government further avers that defense counsel may inspect the evidence, which is being held for introduction at trial, upon request. Similarly, the government contends that the request for discovery and inspection is premature. Additionally, Moran seeks *Kyles* and *Brady* information, as well as the identity and statements of confidential informants and cooperating witnesses. There is no indication that the government is not meeting its obligations to disclose required information. These requests are also premature. Accordingly, this portion of defendant's motion is denied as moot, without prejudice to renew should it become necessary.

■■■ Finally, Moran requests a *Daubert* hearing to preclude the government's expert testimony regarding substance identification (methamphetamine), theoretical weight, and theoretical purity. However, he does not set forth any specific facts that would require preclusion of the expert testimony. Accordingly, he is not entitled to a *Daubert* hearing.

---

**8.** Moran was convicted of a felony in 1978. He was sentenced to five years of probation but was discharged after two and a half years. Thereafter he was issued a Certificate of Relief of Civil Disabilities, so he was not legally precluded from possessing a firearm.

### 6. GPS Device

 Moran separately moves for suppression of any evidence obtained from a GPS device attached to his vehicles as well as any evidence derived from information obtained from the GPS tracking device, as violative of his Fourth Amendment rights. He further requests a *Daubert* hearing regarding the admissibility of GPS evidence. The government opposes this motion.

 The Fourth Amendment protects against unreasonable searches and seizures. U.S. Const. amend. IV. However, where there is no legitimate expectation of privacy, there is no search or seizure within the ambit of the Fourth Amendment. *United States v. Knotts*, 460 U.S. 276, 285, 103 S.Ct. 1081, 1087, 75 L.Ed.2d 55 (1983). There is a diminished expectation of privacy in a vehicle because of its availability to public scrutiny. *Id.* at 281, 103 S.Ct. at 1085. "A person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another." *Id.*

Here Moran complains of a GPS device attached to his vehicle by law enforcement personnel without a warrant. The GPS device tracked the whereabouts of Moran's vehicle on July 29 and 30, 2003, upon his return from a one-day trip to Arizona. Law enforcement personnel could have conducted a visual surveillance of the vehicle as it traveled on the public highways. *See id.* at 282, 103 S.Ct. at 1086. Moran had no expectation of privacy in the whereabouts of his vehicle on a public roadway. Thus, there was no search or seizure and no Fourth Amendment implications in the use of the GPS device.

The cases Moran cites in support of his argument that the GPS information must be suppressed are inapposite. In *United States v. Berry*, 300 F.Supp.2d 366 (D.Md.

2004), the police obtained a court order permitting placement of a GPS device on a vehicle. *Id.* at 368. Thus, the court found admissible the evidence obtained when the device was authorized. With regard to evidence obtained after expiration of the court order, the court found it unnecessary to decide the question since the government did not plan to introduce the evidence. *Id.* In *United States v. Mack*, 272 F.Supp.2d 1174, 1180 (D.Colo.2003), the court merely mentioned the use of a GPS device, pursuant to a court order, in its discussion of traditional investigative techniques used.

In *People v. Lacey*, No. 2463N/02, 2004 WL 1040676 (N.Y. Nassau County Ct. May 6, 2004) (unpublished decision) (disposition in Table at 3 Misc.3d 1103(A)), the court found that "in the absence of exigent circumstances ... the police should have obtained a warrant prior to attaching the GPS to the" vehicle. *Id.* at *8. However, the court went on to determine that the defendant had no expectation of privacy in the vehicle to which the GPS device was attached because "he did not own [it] and [it] was used for the sole purpose of furthering a criminal enterprise." *Id.* at *9. Accordingly, the defendant's motion to suppress was denied. *Id.* at *10. It is also noteworthy that despite surveying cases from other jurisdictions on this issue, the *Lacey* Court failed to reconcile its reasoning with that of the United States Supreme Court in *Knotts*. In fact, the *Lacey* Court did not even mention *Knotts*.

In *State v. Jackson*, 150 Wash.2d 251, 76 P.3d 217 (2003) (en banc) the court held that a warrant was required for the installation of a GPS device on a vehicle, pursuant to the Washington State Constitution. *Id.* at 224. The court noted that there was no Fourth Amendment issue. *Id.* at 222 n. 1. Rather, the issue was whether the war-

rantless use of the GPS device ran afoul of the more restrictive state constitutional provisions. *Id.* at 222. Subjective expectations of privacy played no role in the analysis. *Id.*

 Accordingly, there was no Fourth Amendment violation and suppression of the GPS information is not warranted. Further, Moran does not set forth any specific facts that would entitle him to a *Daubert* hearing to preclude expert testimony regarding the GPS.

### B. *Heffner*

Heffner argues that no evidence linked him to criminal activity and the search warrant lacked particularity and was overbroad, and therefore any evidence recovered during execution of the search warrant should be suppressed. He also requests notice of any government intention to use prior bad acts at trial and expert testimony. The government contends that sufficient evidence was presented in the search warrant application linking Heffner to methamphetamine possession and distribution to constitute probable cause to issue the search warrant. The government further argues that the search warrant was sufficiently specific with regard to the locations to be searched and the evidence sought. It indicates that at this time there is no intent to introduce prior acts, but will notify Heffner if this changes. The government sets forth its intention to introduce expert testimony regarding DEA laboratory testing of the recovered substances and coded-language drug conversations.

 The search warrant authorized the search of, inter alia, Heffner's person, a 1997 Mercury sedan registered to Betty R. Gaffney, and a 1985 Harley Davidson motorcycle registered to Heffner. Judge Donalty issued an additional search warrant on August 22, 2003, authorizing the search of a 1977 Winnebago registered to Shayne T. Bazinet.

The information regarding Heffner set forth in the search warrant application is as follows. Grogan stated that based upon his investigation, he had probable cause to believe that Moran was frequently traveling to Arizona to secure large quantities of methamphetamine, which he distributed to, inter alia, Heffner upon his return. On June 25, 2003, Heffner (a known member of Hell's Angels) called Moran on –1193 and discussed meeting in Troy the next evening. On July 1, 2003, at 6:11 p.m. Heffner called Mancini from –1193. An Oneida County Sheriff's Deputy observed a 1997 Mercury sedan registered to Betty Gaffney at approximately 5:15 p.m. on July 1. This vehicle was also observed numerous times at 403 Fishing Rock Road. On July 7, 2003, Heffner called Moran and during the conversation asked if Moran ever got it (referring to a medical condition). Moran misunderstood the question and replied that he did not go yet (referring to a trip to Arizona).

On July 8, at 9:56 a.m. Moran called Heffner, notifying him about the federal raids that had occurred at various Hell's Angels club houses in Arizona. Moran told Heffner to spread the word and to check with Heine. At 11:29 a.m. on July 8 Heffner left a message for Moran telling him to check his email.

On July 12, 2003, Moran made a one-day trip to Arizona, arriving back at the Hawkins Corners residence in the early morning hours of July 14. On July 14, 2003, a 1992 Chevrolet station wagon registered to Shayne T. Bazinet was observed at the Hawkins Corners residence, along with three Harley–Davidson motorcycles belonging to Hell's Angels and prospects. At 2:26 p.m. on July 14 Moran called Heffner and told him to get down here. At

10:55 p.m. on July 14 Heffner called –1193 and spoke with Lashway.

On July 28, 2003, Moran again made a one-day trip to Arizona, returning on July 29. At 8:18 p.m. on July 29 Moran called Heffner. Moran told Heffner that he was leaving New York City and was going straight home. Heffner asked Moran if he could swing up on the way. Moran said that if he couldn't stop on the way through, he would stop later. Heffner told Moran that if not, Heffner could come to Moran's house. At 2:03 a.m. on July 30 Moran called Heffner, telling him that he had one guy at his house to get rid of and then Moran would go to Heffner's house. Heffner said he would leave the door open, and thanked him. At 5:06 a.m. on July 30 Moran called Heffner's telephone and left a message saying he was in Utica and would be up in about fifteen minutes. At 5:07 a.m. Moran called Heffner, describing his progress on the road, consistent with traveling from Mathis's residence to Heffner's residence. On August 4 and 5 Heffner called –1193 and discussed with Cochis and Jeffrey computer problems he was having.

Moran made another trip to Arizona on August 14, returning on August 16. Shortly after arriving at the Hawkins Corners residence on August 16 Moran called, inter alia, Heffner. Moran told Heffner to come see him, the cow's home.

Heffner was a known Hell's Angel, and Hell's Angels were known to be involved in methamphetamine distribution. Multiple telephone conversations took place between Heffner and Moran, several of which occurred shortly after Moran made a short trip to Arizona. Grogan opined that Moran made the short trips to Arizona to obtain methamphetamine which he then supplied to several individuals, including Heffner. Once after an Arizona trip Moran traveled to Heffner's 403 Fishing Rock Road residence. The 1997 Mercury sedan was observed in the vicinity of the Hawkins Corners residence and frequently at 403 Fishing Rock Road.

■ Based upon these facts as set forth relating to Heffner, the issuing Judge had a substantial basis for finding probable cause to believe that a search of Heffner's person, his residence at 403 Fishing Rock Road, and the 1997 Mercury sedan would yield contraband or evidence of a crime. See Gates, 462 U.S. at 238–39, 103 S.Ct. at 2332. However, there is no basis for finding probable cause related to the 1985 Harley Davidson motorcycle or the 1977 Winnebago registered to Shayne T. Bazinet. There is not even a mention of Heffner's motorcycle or the Winnebago in the search warrant application. Further, even if the facts set forth in the previous wiretap applications could be considered by Judge Donalty in issuing the search warrants, there would be no substantial basis for finding probable cause to search the motorcycle or the Winnebago. The only tie to the motorcycle and the Winnebago is Heffner's or his girlfriend's ownership. Quite simply, there is no basis whatsoever for finding probable cause to believe that evidence of criminal activity would be found in a search of the motorcycle and Winnebago. All evidence seized from the search of the motorcycle and the Winnebago must be suppressed.

■ With regard to specificity, the warrant application specifically authorizes a search for methamphetamine and related items. It sets forth in detail the locations to be searched. It does not lack particularity and it is not overbroad. This portion of Heffner's motion is denied. The portion of the motion requesting notice of intent to use bad acts and expert testimony is denied as moot, without prejudice.

### C. *Lashway*

Lashway's first motion seeks omnibus relief. His second motion seeks suppression of the eavesdropping warrants (June 16 Warrant, July 15 Warrant, August 1 Warrant, and September 2 Amended and Extended Warrant), or in the alternative a *Franks* hearing. The bases for his motions will be discussed seriatum.

■ Lashway first argues that count one of the indictment, charging he, Moran, Faith Burke, Cook, Corigliano, Heffner, Heine, and Mathis with conspiracy to possess with intent to distribute and distribute methamphetamine, must be dismissed because there is insufficient evidence of conspiracy. He cites the Tomasone affidavits, contending that the facts set forth allege a mere association rather than a conspiracy.

The Second Superseding Indictment was handed up by the grand jury on April 15, 2004. It is presumed that the grand jury had sufficient evidence upon which to act. *See United States v. Weber*, 197 F.2d 237, 238 (2d Cir.1952). Count One of the Second Superseding Indictment sets forth the elements of a violation of 21 U.S.C. § 841(a)(1) and the time and place of the alleged commission of the crime and is therefore valid on its face.[9] *See United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000); *United States v. Luguis*, 166 F.Supp.2d 776, 778–79 (S.D.N.Y.2001) (citing *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir.1998)). As it is valid on its face, Count One of the Second Superseding Indictment survives Lashway's motion to dismiss. *See Alfonso*, 143 F.3d at 775.

■ Lashway next requests a Bill of Particulars pursuant to Fed.R.Crim.P. 7(f). He seeks specific information regarding the alleged conspiratorial acts by Lashway and co-conspirators and the methamphetamine allegedly possessed with the intent to distribute.

■ A bill of particulars is warranted when the charge in the indictment is of such a nature that the defendant is not advised of the specific acts of which he is accused. *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir.1999). However, it "is not necessary where the government has made sufficient disclosures concerning its evidence and witnesses by other means." *Id.*

The record in this matter, including the motions and exhibits addressed herein, is replete with the details of the alleged acts of Lashway and the co-conspirators in furtherance of the alleged conspiracy to possess with the intent to distribute and distribute methamphetamine. Clearly the government has made sufficient disclosure concerning the evidence and witnesses against Lashway and the co-conspirators to inform Lashway of the specific acts of

---

**9.** Count 1 of the Second Superseding Indictment reads as follows:

From about January 2002, through and including August 17, 2003, in the State and Northern District of New York and elsewhere, the defendants Robert P. Moran, Jr., Faith Burke, David L. Cook a/k/a "Crockett," Thomas Corigliano, Chance E. Heffner, Gregory Heine a/k/a "Pep" a/k/a "Simon," Donald Lashway, and James H. Mathis, did knowingly and intentionally combine, conspire, confederate, and agree together with each other and others known and unknown, to possess with intent to distribute and distribute methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1), and aided and abetted such conspiracy.

(Second Superseding Indictment at 1.) Count 1 continues to describe the manner and means by which the conspiracy was carried out, to wit: the co-conspirators met with Moran before and after Moran took trips to Arizona to secure methamphetamine, in quantities greater than 50 grams, for redistribution to the co-conspirators. *Id.* at 2.

which he is accused and make a bill of particulars unnecessary. *See id.*

■ Lashway next requests certain specific discovery, as well as an audibility hearing. He is entitled to the discovery he seeks pursuant to Fed.R.Crim.P. 16, according to the government. Further, the government asserts that it has not detected any audibility difficulties, but will provide access to any recordings to defense counsel so that audibility determinations can be made. Accordingly, Lashway's motions for discovery and for an audibility hearing are denied without prejudice to renew should it become necessary.

■ Similarly, Lashway seeks *Brady* material. The government indicates that it will fulfill its obligations to provide *Brady* material. Again, Lashway's motion is denied without prejudice.

■ Lashway next seeks suppression of evidence and testimony derived from the use of any informant. No authority is cited in support of this requested relief, and it is unclear specifically what Lashway seeks to exclude. Accordingly, this portion of his motion will also be denied.

■ Lashway seeks to exclude evidence of other prior crimes, wrongs, or acts which may be used against him by the government, pursuant to Fed.R.Evid. 404(b). The government did not address this point. Accordingly, the government is directed to promptly notify Lashway of its intent to introduce such evidence and Lashway will then be permitted to renew this motion. *See* Fed.R.Evid. 404(b).

■ Lashway seeks severance of trials pursuant to Fed.R.Crim.P. 14. Lashway contends that he and the other defendants have antagonistic defenses, there is personal animosity among certain defendants that would prejudice his right to a fair trial, and there would be prejudicial spill

over if co-defendants are found responsible for engaging in the alleged offenses, because of their differing culpability. He cites no authority for this request, and gives no specific facts to support his argument that severance is required to preserve his right to a fair trial. Lashway has not met his heavy burden of establishing that he would be so severely prejudiced by a joint trial so as to effectively deny him a fair trial. *See United States v. Chang An–Lo,* 851 F.2d 547, 556 (2d Cir. 1988).

Lashway's request to seek additional relief in the future is granted to the extent that the need for such relief arises.

■ By separate motion Lashway seeks to suppress evidence that was obtained by means of electronic surveillance, or in the alternative to hold a *Franks* hearing. He contends that probable cause to issue the eavesdropping warrants was lacking.

As set forth above, sufficient facts were set forth in both the June 16 Warrant and July 15 Warrant applications to provide Judge Donalty a substantial basis for finding probable cause to believe that the interception of communications over –1193 and –1185 would yield evidence of methamphetamine trafficking by Moran, Cochis, and unknown co-conspirators. With regard to these warrants, Lashway argues that the only information regarding him in the applications establishes an association with Donna Snay (to whom the cellular telephone he used was listed) and the Hell's Angels. This argument ignores the fact that the June 16 Warrant targeted Moran and Cochis and *unknown* co-conspirators. Even a failure to mention Lashway in the June 16 Warrant application would not be fatal to a finding of probable cause, because his involvement could have been (and apparently was) uncovered by the interceptions obtained from

execution of the June 16 Warrant. *See Hoey*, 1991 WL 239946, at *6–7 (noting that it is not required to establish probable cause with regard to every defendant ultimately indicted).

The July 15 Warrant application named Lashway, Moran, and others as a targets of the methamphetamine trafficking investigation. Indications of Lashway's involvement in the methamphetamine trafficking were set forth in the application. Lashway was known to be a Hell's Angel, and Hell's Angels were an outlaw motorcycle gang known to participate in methamphetamine trafficking. In early July, upon being notified that the FBI had executed a raid on various Hell's Angels club houses in Arizona, Moran notified, inter alia, Lashway. Further, Jecko noted that Lashway, Hefner, Bugsy Moran, and Heine showed respect for and deference toward Moran in numerous telephone calls, indicating that each played some role in the Hell's Angels (and possibly a methamphetamine trafficking) organization. Thus, Judge Donalty had a substantial basis for finding probable cause to issue the July 15 Warrant.

The August 1 Warrant application contained facts indicating Lashway's possible participation in narcotics trafficking. Two informants told law enforcement personnel that Lashway distributed methamphetamine and/or cocaine. Numerous calls and visits between Moran and Lashway took place. Tomasone opined that the content of the conversations intercepted on –1193 (authorized by the June 16 Warrant) related to payment for or receipt of methamphetamine by Lashway. Lashway discussed meeting Moran shortly before Moran's July 12 trip to Arizona. He visited Moran's Hawkins Corners residence shortly after Moran's return from Arizona, and again a few days later after, according to Tomasone's opinion, Moran had re-

ceived a package containing methamphetamine from Arizona. Analysis of Lashway's phone records from May 25 to June 24 showed 36 calls to Cunningham, 10 calls to Heffner's 403 Fishing Rock Road residence, 18 calls to the Hawkins Corners residence (–1193), and numerous calls to the Hell's Angels club house and other Hell's Angels. Further, Lashway made four calls to apparent career criminal Juan Rivera within two days before visiting Moran on June 25, and four calls on one day after that visit. A substantial basis existed for finding probable cause to issue the August 1 Warrant.

The application for the September 2 Amended and Extended Warrant similarly contained ample facts upon which probable cause could have been found. Three of the telephones sought to be intercepted were listed to Donna Snay. Lashway used one of the telephones, Sicley used one, and Hunt used one. Lashway changed the number of his cell phone twice between issuance of the August 1 Warrant and the application made on August 26. The application set forth a series of telephone calls between Lashway and Bugsy Moran (a Rochester Hell's Angel) at the time Moran was returning from an Arizona trip in mid-August. Upon Moran's return, Lashway and Sicley visited the Hawkins Corners residence, stayed for one hour, then proceeded to the Rochester Hell's Angels club house. The search warrant executed on the next day, August 17, yielded eight ounces of methamphetamine from the Hawkins Corners residence and several more ounces elsewhere.

The application set forth a series of telephone calls between Lashway and Sicley in early August while Lashway was planning a visit to see Moran. The content of the conversations indicated that Sicley was anxious to know when the visit occurred. After Lashway did visit Moran, he at-

tempted several times to contact Sicley. Again, Lashway and Sicley went to the Hawkins Corners residence on August 16, upon Moran's return from Arizona, and then proceeded to the Rochester Hell's Angels club house. On August 20 conversations occurred between Lashway and Sicley indicating that they would meet so that Lashway could provide Sicley with methamphetamine.

A series of telephone calls between Lashway and Cunningham were also set forth. Lashway, Lust, and Cunningham visited Moran's Hawkins Corners residence shortly after Moran's July 12 trip to Arizona. On August 16, Lashway told Cunningham he wanted to see him right away. Later that day, while Lashway and Sicley were en route to Moran's, Cunningham told Lashway that he was "safe" in Maryland. On August 18, after the search warrant had been executed, Cunningham called and talked to Lashway, but Lashway said nothing audible. One minute later, using a different telephone, Cunningham called again, and Lashway described the raid of Heffner's house and Moran's arrest. Lashway wondered if they would be next, and Cunningham attempted to reassure him that all the warrants would have been executed at the same time. On August 19, still using a different telephone, Cunningham called Lashway to let him know that he was going to Baltimore, and that Lashway should let everyone know that he was doing our thing with them at one of their houses. Tomasone opined that this call connected Cunningham to the methamphetamine conspiracy.

A telephone call between Lashway and Hunt on August 18 pertained to cleaning up paperwork at the Troy Hell's Angel's club house. Tomasone opined that this conversation described damage control in the wake of the search warrant execution.

These facts, as set forth in the August 1 Warrant application and the application for the September 2 Amended and Extended Warrant, provided a substantial basis for Judge Teresi to find probable cause that interception of calls on Lashway's cell phone would yield evidence of his participation in the methamphetamine trafficking conspiracy. Lashway's second motion to suppress is denied.

Lashway's motion to make further motions as necessary is granted.

### D. *Cook*

Cook is charged in the Second Superseding Indictment with conspiracy to possess with intent to distribute and distribute methamphetamine (Count 1) and possessing with the intent to distribute methamphetamine in a quantity of 50 grams or more (Count 2). He seeks omnibus relief as well as suppression of all evidence obtained in a search of his residence at 309 Jones Road, Ilion, New York, on August 17, 2003.

The government states that it will meet its obligations regarding discovery, *Brady* material, and *Giglio* material. It is noted that such obligations include preservation and making available recordings to be introduced as evidence. Cook's motions in this regard are therefore denied without prejudice to renew should it become apparent the government is not meeting its obligations.

Cook moves to dismiss the indictment to the extent that it charges him with conspiracy due to insufficient evidence. As was noted with regard to Lashway, it must be presumed that the grand jury had sufficient evidence upon which to act when it handed down the indictment. *See Weber*, 197 F.2d at 238. Count One of the Second Superseding Indictment sets forth the elements of a violation of 21 U.S.C. § 841(a)(1) and the time and place of the

alleged commission of the crime and is therefore valid on its face.[10] *See Pirro,* 212 F.3d at 92. As it is valid on its face, Count One of the Second Superseding Indictment survives Lashway's motion to dismiss. *See Alfonso,* 143 F.3d at 775.

Cook suggests that the Grand Jury minutes should be reviewed in order to determine whether sufficient evidence of conspiracy was presented to sustain the indictment. However, a defendant must submit specific, credible evidence from which a court could determine that insufficient evidence was presented to the grand jury. *See United States v. Siebrecht,* 44 F.2d 824, 825–26 (E.D.N.Y.1930). If at least some competent evidence was presented to the grand jury, the indictment will stand. *See id.* at 826; *see also United States v. Bocio,* 103 F.Supp.2d 531, 534–35 (N.D.N.Y.2000) (noting that a hearing to establish sufficiency of the evidence before the grand jury is not appropriate because indictments are not generally open to such a challenge). Evidence available upon which the search warrant was based included Cook meeting with Moran at the Hawkins Corners residence before and after trips to Arizona in July and August 2003. Evidence obtained at the time of the search warrant included quantities of methamphetamine found at the Hawkins Corners residence and elsewhere. Thus, that at least some competent evidence was available for presentation to the grand jury, together with the presumption that the grand jury had competent evidence, is sufficient to sustain the indictment. Cook's motion to dismiss the conspiracy count of the indictment is denied.

Cook next seeks an order requiring the government to provide notice of intent to use prior convictions to impeach pursuant to Fed.R.Evid. 609. The government responds that it is not aware of any prior convictions but will notify Cook if it becomes aware. This portion of Cook's motion is denied.

Cook also seeks an order requiring the government to provide a notice of intent to use hearsay statements not covered by exceptions. The government responds that it has no obligation to provide such a notice of intent. Moreover, as the government points out, Cook cites no authority for the proposition that he is entitled to such notice. Accordingly, this portion of Cook's motion is denied.

In his supplemental motion Cook joins his co-defendants' motion to suppress the evidence collected during execution of the wiretap warrants.[11] In support, he adds the argument that the controlled buy of methamphetamine by the confidential informant contradicts the statements in the warrant applications that traditional investigative techniques failed or would likely be unsuccessful. He argues that the controlled buy establishes that such traditional investigative techniques were and could have been successful, citing *Lilla* in support. As noted above, the circumstances in *Lilla* differed significantly from the circumstances in this case. In *Lilla* an informant and the defendant had a conversation, to which an investigator was listening, regarding narcotics and arranged for a purchase. 699 F.2d at 100–01. The informant went to the defendant's workplace, made the purchase, and discussed potential future transactions when the defendant's supply was replenished. *Id.* at 101. The defendant provided both his work and

---

10. *See supra* note 9.

11. The government does not raise the standing issue in opposition. *See United States v. Gallo,* 863 F.2d 185, 192 (2d Cir.1988) (explaining that only an aggrieved person has standing to move to suppress wiretap evidence).

home telephone numbers so that the informant could contact him. *Id.* This was the sum total of the investigation leading to the wiretap application. *Id.* at 104. In suppressing the wiretap evidence, the court noted that surveillance of the workplace or home could have been successful, and there were no facts presented differentiating this from any other small narcotics case. *Id.*

Here, however, the controlled buy was made by the informant from Cochis. Moran and unknown co-conspirators were also targets of the investigation. Telephone pen register analysis indicated that at least some of the co-conspirators belonged to the Hell's Angels outlaw motorcycle gang. Moran's profession as an attorney coupled with involvement by members of a secretive and oftentimes violent outlaw motorcycle gang made the conspiracy more difficult to investigate than a typical "small-time narcotics case."

Thus, Cook's arguments do not change the result reached with Moran. That is, sufficient facts were presented to support the assertion that traditional investigative techniques were unlikely to succeed, and probable cause existed to issue the wiretap warrants. This portion of Cook's motion to suppress is denied.

■ Finally, Cook seeks suppression of any evidence obtained during execution of the search warrant at his 309 Jones Road residence. He argues that there was no probable cause to include 309 Jones Road as a location to be searched, and a good faith exception to exclusion does not apply. The government argues to the contrary, contending that sufficient facts connected Cook to the narcotics trafficking conspiracy to justify searching his residence. The government also contends that even if probable cause was lacking to search the residence, the officers executing the search were objectively reasonable in relying upon the search warrant and therefore exclusion is not necessary.

The facts relating to Cook contained in the search warrant application can be summarized as follows. Cook was a member of the Highwaymen Motorcycle Club. Multiple telephone calls took place between Cook and Moran in early July attempting to arrange a meeting. In a call on July 4, Moran told Cook there was no hurry because he was not leaving until tomorrow. They then set a time for Cook to go to Moran's house. Later that evening Moran talked to Cook about booking a quicker flight, and they arranged to meet at the club house in Utica. That evening Moran's SUV was observed parked in front of the Highwaymen's club house in Utica. About fifteen minutes later Moran was observed driving away from the club house.

A series of telephone calls between Moran and Cook occurred on July 11, with Moran telling Cook that he was going to get out of here soon, maybe tonight or tomorrow morning. They arranged a meeting at a particular fast food restaurant in Oneida, New York. On July 12, Moran traveled to Arizona and returned late on July 13. During a telephone call on the morning of July 14, Moran told Mathis, a known member of the Highwaymen, that he would stop by Mathis's house after an appointment he had. Grogan opined that Cook met with Moran prior to Moran's trip to Arizona in order to provide Moran with money to purchase methamphetamine in Arizona, and that Moran delivered the methamphetamine to Mathis for the Highwaymen.

During a telephone call on July 17, 2003, Moran and Cook arranged to meet at a discount department store in Herkimer, New York. During a call on August 3, Moran called Cook and asked him how

long he was good for and Cook replied a short time. They talked about meeting Tuesday or Wednesday. Moran talked about cheaper flights than were available from Syracuse. On August 8, Corigliano called Moran and mentioned that Cook had tried, unsuccessfully, to contact Moran. Moran asked if Cook went home or if he was still at Corigliano's bar. On August 13, Moran and Cook were observed exiting the Highwaymen club house, entering Moran's SUV, and then departing. About ten minutes later the SUV was observed parked in the area, and a few minutes later Moran departed alone. Grogan opined that Moran was collecting cash from Cook for his upcoming trip to Arizona. Moran flew to Arizona on August 14 and returned on August 16. Upon his return, Moran called Cook and others to let them know he was home.

Notably, the only mention of Cook's residence was in a telephone call between Moran and Corigliano, when Moran inquired whether Cook went home or was still at Corigliano's bar. There are no facts connecting Cook's telephone calls to Moran and his residence. There is no mention of any surveillance by law enforcement of Cook's residence. There is no information from any informant regarding Cook or his residence. The only locations at which Cook was placed or which he discussed are the Highwaymen club house in Utica, a certain fast food restaurant in Oneida, and a discount department store in Herkimer. In sum, there is no information in the warrant application from which an inference could be drawn that evidence of the methamphetamine trafficking conspiracy would be found at Cook's 309 Jones Road residence. Therefore, the Grogan affidavit could not " 'provide the magistrate with a substantial basis for determining the existence of probable cause.' " *United States v. Swanson*, No. 93–CR–125, 1993 WL 372269 (N.D.N.Y. Sept.15, 1993) (quoting *United States v. Leon*, 468 U.S. 897, 914–15, 104 S.Ct. 3405, 3416–17, 82 L.Ed.2d 677 (1984)).

The government sets forth facts which it asserts establish probable cause connecting Cook to the criminal activity. However, merely connecting Cook to the methamphetamine conspiracy is an insufficient basis for finding probable cause to search his residence. *See Zurcher v. Stanford Daily*, 436 U.S. 547, 555–56, 98 S.Ct. 1970, 1976–77, 56 L.Ed.2d 525 (1978) (stating that the "critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought"); *United States v. Rios*, 881 F.Supp. 772, 774 (D.Conn.1995) (stating probable cause to arrest, standing alone, does not establish probable cause to search home); *United States v. Gomez*, 652 F.Supp. 461, 462 (E.D.N.Y.1987) (same). Further, although Grogan purports to remember telling Judge Donalty that 309 Jones Road was Cook's residence, mere residence by a suspect does not constitute a fair probability that evidence of the criminal activity will be found there. *See Zurcher*, 436 U.S. at 555, 98 S.Ct. at 1976 (stating "[s]earch warrants are not directed at persons; they authorize the search of 'place[s]' and the seizure of 'things,' and as a constitutional matter they need not even name the person from whom the things will be seized"). Rather, there must "be a fair probability that the *premises* will yield the objects specified in the search warrant." *United States v. Travisano*, 724 F.2d 341, 346 (2d Cir.1983) (emphasis added); *Zurcher*, 436 U.S. at 555, 98 S.Ct. at 1976 (noting that a search is reasonable under the Fourth Amendment "only when there is probable cause

to believe that [recoverable items] will be uncovered in a particular dwelling") (internal quotations and citation omitted); *United States v. Feliz*, 182 F.3d 82, 88 (1st Cir.1999) (stating that there is not automatically probable cause to search suspect's residence; rather, there must be a nexus between the objects sought and the location); *United States v. Rosario*, 918 F.Supp. 524, 529–31 (D.R.I.1996) (finding probable cause lacking where affidavit "devoid of any factual basis" that evidence would be found at residence); *Rios*, 881 F.Supp. at 776–77 (finding that where there were no facts to suggest evidence would be found at the home, the search warrant lacked probable cause); *Gomez*, 652 F.Supp. at 463 (finding probable cause lacking where no facts connected criminal activity with the residence).

In sum, the government's arguments are unavailing. Where, as here, there is no factual connection between the criminal activity (methamphetamine trafficking conspiracy) and the residence (309 Jones Road) there is no basis for finding probable cause.

 The government further contends that the good faith exception set forth in *Leon* should apply, and the evidence seized should not be suppressed. The exclusionary rule does not apply where the issuing magistrate was knowingly misled, where the judicial role was wholly abandoned, "where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable," and where reliance on the warrant is unreasonable because it is facially deficient. *United States v. Moore*, 968. F.2d 216, 222 (2d Cir.1992). As noted, there were no facts from which an inference could be drawn that evidence of this methamphetamine trafficking conspiracy would be found at the 309 Jones Road residence. In fact, the only mention of Cook's residence was in a

conversation between two other people, one of whom was wondering if Cook was home or still at a bar. It cannot be said that there was any indicia of probable cause in the affidavit.

This is not a case where some facts in the application connect the criminal activity to the residence, permitting a reasonable officer to rely upon the issuing magistrate's determination that the facts were sufficient to support probable cause. *See, e.g., id.* at 223 (describing facts supporting inference that evidence of drug dealing may be found in apartment, permitting officers to reasonably rely on judge's finding of probable cause); *United States v. Fama*, 758 F.2d 834, 838 (2d Cir.1985) (finding that where there was "evidence sufficient to create disagreement among thoughtful and competent judges as to the existence of probable cause" the officers' reliance on the [judge's] determination of probable cause was objectively reasonable" and exclusion was inappropriate under *Leon* ); *Rosario*, 918 F.Supp. at 532 (finding that the "affidavit was not so facially deficient that the officers could presume it to be invalid" therefore the *Leon* exception applied); *Rios*, 881 F.Supp. at 777–78 (finding the good faith exception applied where no officer reviewing the extremely detailed and specific affidavit would have discerned that it lacked probable cause to search the residence); *Gomez*, 652 F.Supp. at 464 (finding that the officer acted objectively reasonably in relying on warrant where the affidavit recited facts regarding the residence, although the facts were not actually probative of finding evidence of the crime there). Rather, here there were no facts whatsoever connecting the methamphetamine trafficking activity to 309 Jones Road. Accordingly, the *Leon* exception is not applicable and the evidence obtained during execution of the search warrant at 309 Jones Road must be sup-

pressed. Cook's motion to suppress the evidence seized at 309 Jones Road is granted.

### E. Corigliano

#### 1. Omnibus Motion

Corigliano joins Moran's motion to suppress the fruits of the eavesdropping warrants. The government opposes, also relying upon its opposition to Moran's motion.[12] For the reasons stated above with respect to Moran's motion, Corigliano's motion to suppress the fruits of the eavesdropping warrants is denied.

Corigliano seeks Brady and Giglio disclosures from the government. The government states its intention to fully comply with its obligations in this regard. Thus, Corigliano's motion to compel production of Brady and Giglio materials is denied without prejudice.

 Corigliano moves to suppress all evidence recovered during execution of the search warrant at the Snubbing Post. He contends that facts set forth in the application pertaining to the Snubbing Post occurred during innocent activity, not during criminal activity. He argues, therefore, that probable cause to believe that evidence of methamphetamine trafficking would be found at the Snubbing Post did not exist. Three particular instances are illustrative of the inconsistencies in the facts, and opinions drawn from them, set forth in the application, according to Corigliano.

A telephone conversation occurred in early July during which Moran asked Corigliano if he was going to stop by on his way to work. Corigliano stated that the minute he walked in there were 15 people I got to .... Grogan opined that Corigliano was referring to people waiting at the Snubbing Post to purchase methamphetamine. Grogan also opined that exchanges during this conversation constituted an offer by Corigliano to get Moran together with a local methamphetamine dealer so that Moran would not have to fly to Arizona around the Fourth of July, when security was heightened. Corigliano points out that these stated meanings of the conversation are inconsistent. If Corigliano had a local methamphetamine dealer, why would he stop at Moran's residence on his way to work to get methamphetamine for delivery to the people at the Snubbing Post? Why would he participate with Moran in a conspiracy to obtain methamphetamine from Arizona?

On July 31, Corigliano was observed going to Moran's law office. Moran's SUV was later seen at the Snubbing Post. Grogan opined that Corigliano went to the law office to purchase methamphetamine from Moran and used his vehicle to transport the narcotics. Corigliano points out the inconsistency in Grogan's opinion, considering that Corigliano did not return to the Snubbing Post after stopping by the law office. Rather, it was Moran's vehicle that was later observed there.

On August 11, 2003, Corigliano visited the Hawkins Corners residence. Grogan opined that the visit was so that Corigliano could provide money to Moran, which he would use to purchase methamphetamine during his upcoming trip to Arizona. In a later telephone conversation, Moran and Corigliano agreed that they needed to see each other. Grogan opined that they needed to see each other to make a narcotics transaction. Two inconsistencies are pointed out here. First, if Corigliano visited Moran on August 11 to provide him money with which to purchase drugs in Arizona, why did Moran call various others

---

12. Again, the government does not raise the standing issue. See Gallo, 863 F.2d at 192.

upon his return, but not Corigliano? Also, the later call agreeing that they needed to get together (to conduct a drug transaction) is inconsistent with Corigliano's visit to Moran's residence earlier that day.

■ The inconsistencies pointed out by Corigliano appear to be valid. Further, some of the conversations relied upon in the application could easily have been innocent activity. That there was another possible interpretation of the conversations and involvement of Corigliano with Moran is beside the point. Similarly, Corigliano's connection with the Snubbing Post could have been innocent. However, Grogan opined otherwise based upon his experience in law enforcement and this investigation. Judge Donalty was entitled to rely upon not only the facts recited in the application, but also the opinion of the investigator (Grogan). *See United States v. Young,* 745 F.2d 733, 758 (2d Cir.1984) (stating that issuing judge was entitled to credit the specialized knowledge of the law enforcement officer). While it is doubtful that a finding of probable cause based solely upon the expertise of a law enforcement officer would pass constitutional muster, *see United States v. Guzman,* No. S5 97 CR 786(SAS), 1998 WL 61850, at *4 (S.D.N.Y. Feb.13, 1998), where, as here, there are facts connecting the location to be searched with the criminal activity being investigated, there can be a substantial basis for the finding of probable cause. Here facts connected the Snubbing Post with Corigliano's and Moran's alleged criminal conduct. Those facts, coupled with Grogan's opinion about conversations, albeit subject to dispute, provided sufficient basis for a determination that there was a fair probability that the Snubbing Post would yield evidence of methamphetamine trafficking. *See Travisano,* 724 F.2d at 346. Moreover, deference must be accorded to Judge Donalty's determination that

probable cause was established. *See Leon,* 468 U.S. at 914, 104 S.Ct. at 3416. Accordingly, the motion to suppress is denied.

### 2. *Motion to Dismiss the Indictment*

Corigliano moves to dismiss the indictment, arguing that it was obtained in violation of his state plea agreement and therefore violative of due process. He contends that one of the terms of his plea agreement with the state was that he would not be prosecuted on federal charges, and that the plea agreement was reached with the knowledge, consent, and participation of the United States Attorney's office and the FBI, thereby binding them.

■ A plea of guilty must be "voluntary and knowing" and if it was induced by promises, the essence of those promises must in some way be made known. *Santobello v. New York,* 404 U.S. 257, 261–62, 92 S.Ct. 495, 498, 30 L.Ed.2d 427 (1971). Further, "when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." *Id.* at 262, 92 S.Ct. at 499. Agreements entered into by the state are not binding upon federal prosecutors without their "knowledge and consent." *United States v. Fuzer,* 18 F.3d 517, 520 (7th Cir.1994); *United States v. Roberson,* 872 F.2d 597, 611 (5th Cir.1989).

■ Corigliano has not established that his state plea agreement included an agreement that there would be no federal prosecution. There is nothing in the record to indicate that the plea agreement was memorialized in writing. At his change of plea the Assistant District Attorney who prosecuted the charges set forth the terms of the plea agreement as follows: Corigliano would be sentenced to jail for three to nine years upon his plea of guilty

to the specified charge, and all charges against his wife would be dismissed. (Gov't Resp. Ex. C, Plea Tr. at 2–3.) The court added that there would be a concurrent one to three year sentence on the conspiracy charge, a surcharge, driver's license suspension, and forfeiture of cash seized. *Id.* at 3. Corigliano's counsel also added that the appropriate release from disabilities would be granted so that Corigliano could retain his liquor license. *Id.* at 3–4. Further conversation regarding Corigliano's wife ensued. The court then asked: "Mr. Corigliano, do you feel that you understand the offer that's being made by the People?" *Id.* at 5. He answered: "Yes, sir." *Id.* He conferred with his attorney for a moment and then reiterated that he understood. The court asked: "Has anyone made you any other promises other than what's been stated on the record?" Corigliano responded: "No, sir." No mention was made of any agreement that federal authorities would forgo prosecution as a condition of the guilty plea. Further, the Assistant United States Attorney in charge of the federal prosecution submitted a sworn affidavit stating that he had no discussion with either state authorities or Corigliano's attorney before the guilty plea was entered. There is no indication in the record to the contrary. Corigliano has not established that (1) no federal prosecution was a term of his state plea agreement, or (2) the federal prosecutor had knowledge of or consented to any state plea agreement. Thus, the federal prosecution is not barred by the state plea agreement and the motion to dismiss the indictment is denied. *See Fuzer,* 18 F.3d at 520–21.

Corigliano further argues that the supervisory powers of the court permit dismissal of the indictment, as contrary to the policy against multiple prosecutions for the same act. *See United States v. Hasting,* 461 U.S. 499, 505–06, 103 S.Ct. 1974, 1978–

79, 76 L.Ed.2d 96 (1983) (discussing the supervisory powers of the federal courts); *see also Petite v. United States,* 361 U.S. 529, 530, 80 S.Ct. 450, 451, 4 L.Ed.2d 490 (1960) (per curiam) (granting prosecutor's motion to remand for dismissal of the indictment as contrary to the government's policy against multiple prosecutions based upon the same conduct). The *Petite* "policy affords defendants no substantive rights. It is 'merely an internal guideline for exercise of prosecutorial discretion, not subject to judicial review.'" *United States v. Catino,* 735 F.2d 718, 725 (2d Cir.1984) (quoting *United States v. Ng,* 699 F.2d 63, 71 (2d Cir.1983)). It would be inappropriate to exercise supervisory powers and dismiss the indictment, brought in the exercise of prosecutorial discretion, even if brought in contravention of internal guidelines. *See id.*

■ Alternatively Corigliano seeks to preclude the use of a statement he gave in connection with his cooperation with the state authorities, on the ground that the statement was not to be used in any prosecution of him and doing so would violate the agreement and his due process rights. The government informed Corigliano that it would use the statement only to impeach him if he testified contrary to its contents. (Gov't Mem. at 14–15.)

Corigliano gave this three-page statement on October 31, 2003, before state authorities. (Gov't Resp. Ex. B.) No federal authorities were present. The statement first sets forth Corigliano's knowledge and waiver of his right to remain silent as well as his right to have his attorney present. It then states: "I give this statement with my Attorney Frank Mellace's knowledge and I understand that no portion of this statement will be used to prosecute me in any criminal activity." *Id.* at 1. There is no verification from any

state authority that the state agreed not to use the statement. Even assuming that the state did make that agreement, the federal authorities were not involved and did not agree not to use the statement. The federal authorities are not bound by an agreement to which they had no knowledge. *See Roberson*, 872 F.2d at 611 ("If state agreements that immunize criminal defendants from state charges could bind federal prosecutors, state prosecutors would be able to usurp federal prosecutorial discretion."); *Fuzer*, 18 F.3d at 520.

Corigliano's motion to dismiss the indictment is denied. The October 31, 2003, statement given to the state authorities is admissible to impeach, therefore his motion alternative motion to preclude is denied.

## V. CONCLUSION

### A. Moran

The wiretap, amendment, and extension applications sufficiently set forth other investigative procedures that were tried with limited success and why traditional investigative techniques appear unlikely to succeed if tried or be too dangerous. Purported misstatements and omissions regarding the necessity requirement and privilege in the wiretap applications were not misstatements or omissions. Moran failed to establish that purported misstatements and omissions with regard to the finding of probable cause were made with the intent to deceive the court, or were necessary to the finding of probable cause. A *Franks* hearing is not required. Investigators executed the eavesdropping warrants using objectively reasonable interception and minimization procedures. Therefore, suppression or a hearing are not required for improper minimization.

Moran has not established that the wiretap warrants and or their execution violated statutory or constitutional requirements. Suppression is not required.

The search warrant specifically set forth the locations to be searched and the property to be seized relating to the alleged methamphetamine trafficking conspiracy. Sufficient facts were set forth in the application connecting Moran's person, the Hawkins Corners residence, Moran's vehicles, and his law office from which Judge Donalty could find probable cause that the sought-after evidence of methamphetamine trafficking would be found at those locations. The investigator who seized the rifle seized at the Hawkins Corners residence reasonably believed it was unlawfully possessed, and it was seized lawfully pursuant to the plain view doctrine.

No basis exists to order disclosure of grand jury minutes or dismissing the indictment as against Moran. His requests for discovery, *Kyles* materials, and *Brady* materials are premature. No facts warrant holding a *Daubert* hearing to preclude the government's expert testimony. Finally, there was no constitutional violation in attaching a GPS to Moran's vehicle, and no facts entitling him to a *Daubert* hearing on expert GPS testimony.

Moran's motions to suppress and for a *Daubert* hearing are denied.

### B. Heffner

Sufficient facts were set forth in the search warrant application connecting Heffner, his residence at 403 Fishing Rock Road, and the 1997 Mercury sedan registered to Betty R. Gaffney to the methamphetamine trafficking conspiracy from which the issuing judge derived a substantial basis for finding probable cause to search. However, no facts connected the 1985 Harley Davidson motorcycle or the 1977 Winnebago registered to Shayne T. Bazinet. There was no basis to believe that the contraband sought would be found

in the motorcycle or the Winnebago. Heffner's motion to suppress is denied with regard to his person, his residence at 403 Fishing Rock Road, and the 1997 Mercury sedan. His motion is granted with respect to the 1985 Harley Davidson motorcycle and the 1977 Winnebago.

The warrant application sets forth sufficient detail—it does not lack particularity and it is not overbroad. Heffner's motion requesting a notice of intent to use bad acts and expert testimony is moot.

## C. *Lashway*

Count One of the indictment is valid on its face and survives a motion to dismiss. The government has made sufficient disclosures of evidence and intended witnesses such that a bill of particulars is not warranted. An order requiring the government to provide required discovery and *Brady* material is unnecessary as the government states its intention to meet its obligations. Lashway's motion to suppress evidence and testimony derived from informants is wholly unsupported. The government must promptly inform Lashway of its intent to introduce evidence of prior bad acts, and Lashway will be permitted to move to exclude such evidence at that time. Lashway has not shown that severance of trials is warranted. Lashway may seek additional relief if necessary in the future.

Sufficient facts were set forth in the eavesdropping warrant applications, including the June 16, July 15, and August 1, applications, to provide a substantial basis for finding probable cause that intercepting his calls would yield evidence of methamphetamine trafficking. The motion to suppress the fruits of the eavesdropping warrants is denied.

## D. *Cook*

Based upon the government's assertions that it will meet its obligations regarding discovery, as well notification of intent to use any prior convictions, Cook's motion in this regard is denied without prejudice. The Second Superseding Indictment is valid on its face and therefore should not be dismissed. Review of the grand jury minutes is not warranted because it is apparent that the grand jury had some competent evidence. There is no basis for Cook's request for notice of intent to use hearsay and his motion in this regard is denied. Cook's additional arguments regarding suppression of the eavesdropping warrants are not well taken and do not alter the determination that suppression or a *Franks* hearing is not warranted.

No facts connecting Cook or the methamphetamine trafficking conspiracy to his residence at 309 Jones Road were set forth in the application. Therefore, there was no substantial basis for a finding of probable cause to search 309 Jones Road. Additionally, the good faith exception does not apply, because a reasonable officer could not rely upon the magistrate's determination of probable cause where no facts in the application connected the alleged criminal activity with the residence. Accordingly, any evidence seized at 309 Jones Road must be suppressed.

## E. *Corigliano*

For the reasons set forth in the analysis of Moran's motion, Corigliano's motion to suppress the fruits of the eavesdropping warrants is denied. His *Brady* and *Giglio* requests are denied without prejudice based upon the government's representation that it will fulfill its obligations. Sufficient facts were set forth in the search warrant application to support Judge Donalty's finding that a fair probability existed that evidence of methamphetamine traf-

ficking would be found at the Snubbing Post. Corigliano's motion to suppress evidence seized at the Snubbing Post is denied.

Nothing in Corigliano's state plea agreement precluded a federal prosecution. Even if foregoing a federal prosecution was part of the plea agreement, nothing bound the federal prosecutor to such an agreement. Exercise of supervisory powers of the court to dismiss an indictment that was brought in exercise of prosecutorial discretion would be inappropriate. Thus, Corigliano's motion to dismiss the indictment is denied. His alternative request for preclusion of a statement he gave to state authorities is denied because there is no indication that the state authorities agreed that the statement would not be used in any prosecution and federal authorities are not bound by an agreement to which they were not a party. Corigliano's statement of October 31, 2003, is admissible to impeach any contrary testimony he may give.

Accordingly, it is

ORDERED that

1. Moran's motions are DENIED in their entirety;

2. Heffner's motion to suppress is GRANTED with respect to the 1985 Harley Davidson motorcycle and the 1977 Winnebago and evidence seized from these locations is not admissible in evidence;

3. Heffner's motions in all other regards are DENIED;

4. Lashways motions are DENIED in their entirety;

5. Cook's motion to suppress is GRANTED with respect to the residence at 309 Jones Road and evidence seized from this location is not admissible in evidence;

6. Cook's motions in all other regards are DENIED;

7. Corigliano's motions are DENIED in their entirety; and

8. The Government must comply with all discovery obligations; in the event it fails to do so any defendant may file motions for additional relief.

IT IS SO ORDERED.